**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

HAITIAN BRIDGE ALLIANCE, AFRICAN
COMMUNITIES TOGETHER, and
UNDOCUBLACK NETWORK,

    *Plaintiffs*,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, U.S. CUSTOMS AND
BORDER PROTECTION, U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT, and FEDERAL BUREAU
OF PRISONS,

    *Defendants*.

Case No. 22-cv-8344

---

## COMPLAINT

1.    In September 2021, approximately 15,000 Haitian migrants seeking asylum were sequestered by the United States government in an encampment near the Del Rio, Texas port of entry (hereinafter "CBP Encampment"); surrounded by armed guards; and given little or no access to basic necessities like food, water, shelter, and medical attention, despite triple-digit heat.  U.S. agents harassed and intimidated migrants, including through physical force.  And then, abruptly, the government rounded up and expelled thousands of the migrants, forcing many to return to Haiti, a country that could not safely receive or protect them.

2.    Alarmed by this mistreatment, Plaintiffs Haitian Bridge Alliance ("HBA"), African Communities Together ("ACT"), and UndocuBlack Network ("UBN") (collectively, "Plaintiffs") promptly filed Freedom of Information Act ("FOIA") requests with Defendants, requesting that

they produce records relating to the treatment of the migrants in Del Rio, as well as the government's policies and directives on treatment and processing of migrants. Nearly a year later, Defendant Federal Bureau of Prisons ("BOP") has produced a single document, while Defendants U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE") have produced nothing.

3.      Plaintiffs' need for the requested information has only grown more urgent with each passing day, as more Haitian migrants seek safety in the United States and Plaintiffs advocate for their rights, and the rights of all Black migrants. Reports of mistreatment of Haitian migrants continue.[1] Moreover, the government continues to expel Haitian migrants at record numbers: at least 25,000 in the last year, despite acknowledging the humanitarian crisis in Haiti.

4.      Plaintiffs bring this action under FOIA, 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking declaratory and injunctive relief to compel Defendants to comply with FOIA and to immediately release the improperly withheld agency records.

## BACKGROUND

5.      In September 2021, thousands of Haitian migrants fleeing danger and instability in their homeland began crossing the Rio Grande River from Mexico into Del Rio, Texas, to apply for asylum in the United States—as is their statutory right under U.S. law. By September 19, 2021,

---

[1] *See* Amnesty International, *USA*: *"They do not treat us like people": Race and migration-related torture and other ill-treatment of Haitians seeking safety in the USA* 47 (Sept. 22, 2022), available at: https://www.amnesty.org/en/documents/amr36/5973/2022/en/ (explaining that "consistent and credible evidence" shows that between October 2021 and March 2022 "US immigration authorities detained Haitians in sub-standard conditions, without access to proper information about their immigration processes, interpreters, or to legal representation, and then—within one to two weeks on average—expelled them by plane back to Haiti in chains and shackles").

U.S. government officials had directed at least 15,000 Haitian migrants into a makeshift encampment set up by the U.S. government underneath a bridge near the border and its surrounding area.[2]

6.    The United States government made it clear that these Haitian migrants were not welcome.  The government "responded with militarized force" and "effectively prevented individuals from leaving the encampment."[3]  The scene in the CBP Encampment resembled a war camp, with hundreds of armed agents positioned near thousands of migrants living in unsafe and unsanitary conditions.[4]  "Military-grade, armored Humvees and other vehicles" were positioned "every 100 feet along the US-Mexico border for at least two miles surrounding the encampment, reinforcing a razor wire-topped chain-linked fence along its perimeter."[5]

7.    The U.S. government failed to provide basic provisions including food, water, medical attention, and shelter to migrants in the CBP Encampment.  Dense crowds of people slept

---

[2] Dep't of Homeland Sec., U.S. Customs & Border Protection, Office of Prof'l Responsibility, *Report of Investigation* 2 (July 8, 2022) [hereinafter CBP Report]; *see* James Dobbins, Eileen Sullivan and Edgar Sandoval, *Thousands of Migrants Huddle in Squalid Conditions Under Texas Bridge*, N.Y. Times (Sept. 16, 2021), https://www.nytimes.com/2021/09/16/us/texas-migrants-del-rio.html.

[3] Black Alliance for Just Immigration et al., *Shadow Report to the Committee on the Elimination of Racial Discrimination (CERD), 107th Session (08 – 30 August 2022), Anti-Black Discrimination Against Non-Citizens and Ongoing Violations of International Protections for Migrants, Refugees, and Asylum Seekers of African Descent* 4–5, https://tbinternet.ohchr.org/Treaties/CERD/Shared%20Documents/USA/INT_CERD_NGO_USA_49305_E.pdf [hereinafter Report to CERD].

[4] *See* Jack Herrera, *Why 15,000 Migrants Ended Up in One Spot on the U.S.-Mexico Border*, Politico Magazine (Sept. 23, 2021), https://www.politico.com/news/magazine/2021/09/23/del-rio-desperation-dysfunction-immigration-513978.

[5] Report to CERD, *supra* note 3, at 22 n.40.

on dirt or were forced to wait in triple-digit heat amid conditions of deteriorating sanitation.[6]  CBP personnel "refused to provide beds, cots, blankets, tents, or shelter of any kind."[7]  The government gave migrants little access to clean water and food and provided just a few portable toilets.[8]  Indeed, one Haitian woman witnessed people go "days without food or eating proper meals,"[9] and the top Border Patrol union official in the Del Rio sector reported at one point that there were only 20 portable toilets at the site.[10]  Starved and dehydrated migrants were forced to attempt crossing the dangerous Rio Grande River back to the Mexican town of Ciudad Acuña to buy food,[11] including baby food and formula, water, and hygiene supplies for themselves and others.[12]  Those who did so faced many risks, including drowning, being stopped by CBP officers, and being barred by Mexican and U.S. border officials from returning to the CBP Encampment, where their loved

---

[6] *See* Dobbins et al., *supra* note 2.

[7] Robert F. Kennedy Human Rights & Haitian Bridge Alliance, *Beyond the Bridge: Documented Human Rights Abuses and Civil Rights Violations Against Haitian Migrants in the Del Rio, Texas Encampment* 29 (March 29, 2022), https://rfkhr.imgix.net/asset/Del-Rio-Report.pdf [hereinafter Beyond the Bridge].

[8] Dobbins et al., *supra* note 2.

[9] Beyond the Bridge, *supra* note 7, at 27.

[10] Arelis R. Hernández and Nick Miroff, *Thousands of Haitian Migrants Wait Under Bridge in South Texas After Mass Border Crossing*, Wash. Post (Sept. 16, 2021), https://www.washingtonpost.com/national/haitian-migrants-mexico-texas-border/2021/09/16/4da1e366-16fe-11ec-ae9a-9c36751cf799_story.html?request-id=11740a13-de3e-422c-b5b0-ac91e1dea29c&pml=1.

[11] *See* Report to CERD, *supra* note 3, at 6; Beyond the Bridge, *supra* note 7, at 28.

[12] *See, e.g.*, Uriel J. Garcia, *Feds Work to Reduce Size of Camp Under Del Rio Bridge That's Housing Thousands of Migrants Who Fled Unrest and Natural Disasters*, The Texas Tribune (Sept. 19, 2021), https://www.texastribune.org/2021/09/19/migrants-del-rio-bridge/.

ones waited for them and the crucial supplies they were bringing.[13]   Migrants reported that CBP

personnel denied their requests for medical care and told them to "go back to Mexico."[14]  Others

reported that when they requested medical assistance, they were "given a single piece of bread and

a hot water bottle."[15]  The government also restricted legal service organizations from entering the

CBP Encampment or disseminating legal information, "resulting in the lack of access to legal

resources in Haitian Kreyol for asylum seekers."[16]  It also implemented a flight restriction over the

CBP encampment, denied certain journalists access to the camp, and prevented advocates from

entering the camp.[17]

8.     The mistreatment did not end there.  CBP agents also harassed and intimidated

migrants, including through physical force.[18]  The mistreatment was encapsulated in shocking and

widely circulated images of an encounter between Haitian migrants who were bringing much-

needed food and water back to their families and mounted CBP agents on the afternoon of

September 19, 2021.[19]  As the Haitian migrants attempted to climb onto the U.S. bank of the river,

---

[13] *See* Report to CERD, *supra* note 3, at 6.

[14] Beyond the Bridge, *supra* note 7, at 30.

[15] *Id.*

[16] Report to CERD, *supra* note 3, at 5; *see* Beyond the Bridge, *supra* note 7, at 26, 37.

[17] Beyond the Bridge, *supra* note 7, at 26.

[18] *See* Report to CERD, *supra* note 3, at 5.

[19] *See* Martha Pskowski, *Haitian Migrants Face Tough Choices in Del Rio Amid Crackdown at Texas-Mexico border*, El Paso Times (Sept. 19, 2021), https://www.elpasotimes.com/story/news/immigration/2021/09/19/haitian-migrants-tough-choices-crackdown-del-rio-texas-border/8411152002/.

an agent shouted, "Let's go! Get out now! Back to Mexico!"[20]  He then "menacingly swung his reins like a whip, charging his horse toward the men in the river who were trying to return to [the] encampment" after buying food and water in Ciudad Acuña.[21]  "One migrant fell as he tried to dodge, others shielded their heads with their hands."[22]  Even CBP acknowledged that some Border Patrol agents "used their horses to forcibly block migrants from exiting the river and chased migrants who had successfully exited the river including grabbing one by the shirt and spinning him around," and one Border Patrol agent "used profanity while yelling at a migrant and then pursued him along the river's edge[,] forcing his horse to narrowly maneuver around a small child."[23]  CBP admits that, during this incident, "instead of processing migrants for admission or directing them to an area where thousands of individuals already waited, multiple mounted [Border Patrol agents] used force, or threats of force, to coerce or compel individuals to return to Mexico."[24]

9.    Homeland Security Secretary Alejandro Mayorkas stated that these "horrifying images" "painfully conjured up the worst elements of our nation's ongoing battle against systemic

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] CBP Report, *supra* note 2, at 4; *id.* at 5 ("On multiple occasions, mounted [Border Patrol agents] used force or the threat of force to drive migrants back into the Rio Grande River despite the fact they were well within the territorial boundary of the United States.  At the time the agents used or threatened to use force, the migrants were not threatening the [Border Patrol agents].  Instead, they were attempting to enter or return to the United States, some carrying tickets previously issued by the [U.S. Border Patrol] and many with food for their families.").

[24] *Id.* at 3.

racism."[25]  And Vice President Kamala Harris acknowledged that they "evoked images of some of the worst moments of our history, where that kind of behavior has been used against the Indigenous people of our country, has been used against African Americans during times of slavery."[26]

10.    After subjecting the migrants to these deplorable conditions, the government proceeded to remove them from the CBP Encampment, sending many back to Haiti without any opportunity to access the asylum system or be screened for likelihood of torture in Haiti.[27]  On Friday, September 17, 2021, CBP closed the border at Del Rio,[28] and the next day DHS outlined a "comprehensive strategy" to swiftly expel migrants in Del Rio from the United States, including by "secur[ing] additional transportation to accelerate the pace and increase the capacity of removal

---

[25] The White House, *Press Briefing by Press Secretary Jen Psaki and Secretary of Homeland Security Alejandro Mayorkas, September 24, 2021*, https://www.whitehouse.gov/briefing-room/press-briefings/2021/09/24/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-homeland-security-alejandro-mayorkas-september-24-2021/ [hereinafter Press Briefing].

[26] Katie Rogers and Michael D. Shear, *Biden Condemns Border Patrol Treatment of Haitian Migrants as Expulsions Continue*, N.Y. Times (Sept. 24, 2021), https://www.nytimes.com/2021/09/24/us/politics/biden-border-patrol-haitian-migrants.html.

[27] *See generally* 8 U.S.C. § 1231(b)(3)(A) (stating that the "Attorney General may not remove [a noncitizen] to a country if the Attorney General decides that the [noncitizen]'s life or freedom would be threatened in that country because of the [noncitizen]'s race, religion, nationality, membership in a particular social group, or political opinion"); § 1231 note ("United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture") ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . .").

[28] U.S. Customs and Border Prot., *CBP Temporarily Re-Routing Trade, Travel Traffic From Del Rio Port of Entry to Eagle Pass Port of Entry* (Sept. 17, 2021), https://www.cbp.gov/newsroom/local-media-release/cbp-temporarily-re-routing-trade-travel-traffic-del-rio-port-entry.

flights to Haiti and other destinations in the hemisphere" and by "conducting regular expulsion and removal flights to Haiti, Mexico, Ecuador, and Northern Triangle Countries."[29]

11.    By Sunday, the United States had already sent back three flights of migrants taken from the CBP Encampment, each carrying 145 passengers, to the Haitian capital, Port-au-Prince, and Border Patrol Chief Raul L. Ortiz said some 3,300 migrants had already been removed from the CBP Encampment to planes or detention centers.[30]  He said they were "working around the clock" to "quickly process and remove individuals from the United States."[31]  Indeed, he said he aimed for all the migrants to be "gone within the week."

12.    And they were.  By Friday, September 24, 2021, Secretary Mayorkas announced that the migrants who had come to Del Rio—the great majority of whom were Haitian nationals— had been cleared from the CBP Encampment.[32]  "[L]ast weekend, we had approximately 15,000

---

[29] Dep't of Homeland Sec., *DHS Outlines Strategy to Address Increase in Migrants in Del Rio* (Sept. 18, 2021), https://www.dhs.gov/news/2021/09/18/dhs-outlines-strategy-address-increase-migrants-del-rio.

[30] Molly Hennessy-Fiske, *U.S. begins removing Haitian migrants, but they continue to flock to Texas border*, Los Angeles Times (Sept. 19, 2021), https://www.latimes.com/world-nation/story/2021-09-19/haitian-migrants-continue-to-flock-to-texas-border-some-flown-back-to-homeland-by-u-s.

[31] Juan A. Lozano, Eric Gay, Elliot Spagat And Evens Sanon, *US launches mass expulsion of Haitian migrants from Texas*, Associated Press (Sept. 19, 2021), https://apnews.com/article/immigration-border-haiti-mexico-texas-09d7de5bc57e1dbd92d40751c0d91f69.

[32] Felicia Sonmez and Nick Miroff, *All Migrants Have Been Cleared from Encampment in Del Rio, Tex., Homeland Security Secretary says*, Wash. Post (Sept. 24, 2021), https://www.washingtonpost.com/politics/immigrants-haitians-biden-administration/2021/09/24/a05fd1bc-1d66-11ec-a99a-5fea2b2da34b_story.html.

individuals in the Del Rio section," he said during a White House press briefing. "I committed to addressing that within 10 days, and today we have none."[33]

13.     Although the actual statistics as to where the government sent the migrants after removing them from Del Rio are unclear, the government did fly approximately 4,600 Haitians from Texas to Haiti within a matter of days.[34] Another 8,000 Haitians, fearing they would be deported to danger in Haiti, were compelled to return to Mexico.[35] Others fled to Mexico because of unbearable conditions in the CBP encampment.[36]

14.     The United States government carried out its swift expulsion of migrants from Del Rio under the purported authority of a pandemic-related public health order issued by the Centers for Disease Control ("CDC") under Title 42 of the United States Code, which Secretary Mayorkas maintains has "required the expulsion of unauthorized single adults and family units arriving at the land borders."[37] Although he has stated that "Title 42 is not an immigration authority," he

---

[33] Press Briefing, *supra* note 25.

[34] Priscilla Alvarez, *About 4,600 Haitians Have Been Expelled from the US Since September 19, DHS Says*, CNN (Sept. 29, 2021), https://www.cnn.com/2021/09/29/politics/haitians-expelled-immigration/index.html.

[35] *See* Uriel J. Garcia, *"We Suffered a Lot To Get Here": A Haitian Migrant's Harrowing Journey to the Texas-Mexico Border*, The Texas Tribune (Oct. 1, 2021), https://www.texastribune.org/2021/10/01/haitian-migrants-texas-mexico-border/.

[36] Beyond the Bridge, *supra* note 7, at 27 (explaining that a "majority of individuals interviewed in the migrant shelter in Acuña reported that they were forced to flee the camp because after up to six days of being deprived access to food and water, they experienced extreme hunger").

[37] Dep't of Homeland Sec., *Statement by Secretary Mayorkas on CDC's Title 42 Order Termination* (Apr. 1, 2022), https://www.dhs.gov/news/2022/04/01/statement-secretary-mayorkas-cdcs-title-42-order-termination; *see* U.S. Customs and Border Prot., *COVID-19 CAPIO* (last accessed Sept. 29, 2022), https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/COVID%2019%20Capio.pdf (recommending that agents process subjects "under existing

acknowledged during his remarks in Del Rio on September 20, 2021 that the "majority of migrants continue to be expelled under CDC's Title 42 authority."[38]    The Title 42 public health order is still in effect today.[39]

15.    The U.S. government's mass expulsion of migrants from Del Rio was unfortunately not an isolated incident.  Since September 2021, the United States has expelled more than 25,000 people back to Haiti.[40]  Indeed, the government continues to expel migrants on flights to Haiti.[41] Between September 19, 2021 and March 3, 2022, the United States expelled approximately 18,278 Haitians, of whom 45% were women and children.[42]  Even as conditions worsened in Haiti,[43] the government accelerated expulsions of Haitian migrants in May 2022, putting nearly 4,000 Haitians on 36 deportation flights.[44]  By CBP's own numbers, the United States expelled more than 977,000

---

statutory authorities found in Title 8 of the US code" when a subject "is determined to no longer be amenable under Title 42 CDC Order").

[38] Dep't of Homeland Sec., *Secretary Mayorkas Delivers Remarks in Del Rio, TX* (Sept. 20, 2021), https://www.dhs.gov/news/2021/09/20/secretary-mayorkas-delivers-remarks-del-rio-tx.

[39] Although the Biden administration attempted to lift the order in May 2022, a court in the Western District of Louisiana issued a preliminary injunction that stopped the administration from doing so.  *Louisiana v. Centers for Disease Control & Prevention,* No. 22-CV-00885, 2022 WL 1604901, at *23 (W.D. La. May 20, 2022).  Moreover, the Biden administration continues to defend the legality of its use of Title 42.  *See* Defs.' Opp'n to Pls.' Mot. for Partial Summ. J. at 1, 37, *Huisha-Huisha v. Mayorkas*, No. 21-cv-00100 (D.D.C. Aug. 31, 2022), ECF No. 147.

[40] Eileen Sullivan, *U.S. Accelerated Expulsions of Haitian Migrants in May* (June 9, 2022), https://www.nytimes.com/2022/06/09/us/politics/haiti-migrants-biden.html.

[41] *See id.*; Beyond the Bridge, *supra* note 7, at 18.

[42] Beyond the Bridge, *supra* note 7, at 41.

[43] *See, e.g.*, United Nations, *Haiti: Armed Violence Reaches 'Unimaginable and Intolerable Levels'* (May 17, 2022), https://news.un.org/en/story/2022/05/1118432.

[44] Sullivan, *supra* note 40.

of the 1.99 million individuals encountered at the U.S. land borders since October 2021 under the purported authority of Title 42.[45]

16.　But "Haiti is not able to safely receive or protect people expelled through Title 42."[46]  Migrants who are flown to Haiti are arriving in a country "experiencing a dire security situation, including loss of government control over strategic areas to the hands of dangerous armed gangs."[47]  Human Rights Watch concluded in March 2022 that "[r]eturns to Haiti are life-threatening now, and will continue to be so, until security conditions in Haiti improve."[48]  Two months later, the United Nations High Commissioner for Human Rights explained that "[a]rmed violence has reached unimaginable and intolerable levels in Haiti."[49]

17.　Indeed, Secretary Mayorkas acknowledged in May 2021 (only four months before the government flew thousands of migrants to Haiti) that "Haiti is currently experiencing serious security concerns, social unrest, an increase in human rights abuses, crippling poverty, and lack of basic resources, which are exacerbated by the COVID-19 pandemic" and "determined that we

---

[45] U.S. Customs and Border Prot., *Southwest Land Border Encounters (By Component), Fiscal Year 2022 Stats* (retrieved Sept. 29, 2022), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component.

[46] Report to CERD, *supra* note 3, at 8.

[47] Human Rights Watch, *Haitians Being Returned to a Country in Chaos* (March 24, 2022), https://www.hrw.org/news/2022/03/24/haitians-being-returned-country-chaos.

[48] *Id.*

[49] United Nations, *supra* note 43.

must do what we can to support Haitian nationals in the United States until conditions in Haiti improve so they may safely return home."[50]

18.    Members of Congress and the Inter-American Commission on Human Rights, among others, called for accountability for the September 2021 events in Del Rio[51] but received an inadequate response from the U.S. government.  CBP—which finally issued a report almost ten months later in July 2022—focused its entire investigation on "an incident that lasted approximately 30 minutes" when mounted Border Patrol agents and troopers with the Texas Department of Public Safety "dispersed a large group of migrants gathered near a boat ramp" on September 19, 2021.[52]  But in preparing that report, CBP failed to interview even a single Haitian involved in or who witnessed that incident,[53] despite multiple individuals bravely offering to speak with CBP officers conducting the investigation.  Moreover, though the events in Del Rio, from the migrants' arrival to their removal, spanned more than two weeks, CBP's report did not include details about how the government managed migrants' housing, clothing, shelter, and medical care—let alone how it evaluated whether migrants should be removed or expelled from the United States.

19.    There is an urgent need for transparency about the manner in which the U.S. government responded to the thousands of Haitian migrants who attempted to seek asylum at the border in September 2021, and regarding the government's ongoing response to the migrants who

---

[50] Dep't of Homeland Sec., *Secretary Mayorkas Designates Haiti for Temporary Protected Status for 10 Months* (May 22, 2021), https://www.dhs.gov/news/2021/05/22/secretary-mayorkas-designates-haiti-temporary-protected-status-18-months.

[51] Report to CERD, *supra* note 3, at 7.

[52] CBP Report, *supra* note 2, at 2.

[53] Report to CERD, *supra* note 3, at 7.

continue to attempt to seek asylum at the southwest border every day.  Every additional day of delay affects increasing numbers of migrants, their families, and their communities.  Transparency is paramount to ensure that the government is held accountable for its actions at the border and to ensure that migrants' rights are protected going forward.

20.    For nearly a year, despite this urgency, Plaintiffs have been waiting for answers to FOIA requests submitted in the wake of the events at Del Rio.  In October 2021 and February 2022, Plaintiffs submitted FOIA requests to the Defendants, seeking records relating to Defendants' treatment of the 15,000 migrants in Del Rio, Texas, including efforts to provide food, water, clothing, housing, and medical care to migrants; actions to determine whether migrants should be removed or expelled; and coordination between law enforcement agencies and with other countries.  In addition, Plaintiffs sought information about how the government investigated its own September 2021 response, including investigation of DHS policies, decision-making, or personnel related to treatment of asylum-seeking individuals.

21.    Defendants DHS, CBP, and ICE have failed to produce any records, while Defendant BOP failed to complete production of its records.  As Defendants drag their feet, migrants—who have often made dangerous journeys to seek protection in the United States—continue to face adversity and summary expulsion at U.S. borders under some of these same policies and decisions.

22.    Because Defendants failed to comply with the applicable time-limit provisions of FOIA, Plaintiffs have constructively exhausted their administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i) and are entitled to bring this action seeking the production of records improperly withheld.  Plaintiffs seek the immediate production of all records sought.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B). The Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2), and authority to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202. The Court has personal jurisdiction over the parties.

24.     Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(e) and 1402(a) because Plaintiff ACT is a New York not-for-profit corporation and has its principal place of business in New York, New York.

## PARTIES

25.     **Plaintiff HBA** is a grassroots and community-based non-profit organization with federal 501(c)(3) tax exempt status that advocates for fair and humane immigration policies and provides migrants and immigrants with humanitarian, legal, and social services, with a particular focus on Black migrants, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. HBA works to elevate the issues unique to Black migrants and build solidarity and collective movement toward policy change. Many of the individuals HBA serves seek asylum at the U.S.-Mexico border. HBA staff and volunteers are based at the border or regularly travel there to assist and counsel migrants. HBA will use the information responsive to these FOIA requests to serve clients and community members directly affected by the information, including the thousands of migrants impacted by Defendants' actions in Del Rio, Texas, in September 2021, and the migrants who continue to present at the U.S.-Mexico border every day. In addition, HBA is committed to ensuring government accountability, especially with regard to the government's actions in relation to migrants, and will work with other non-profit and advocacy groups to ensure that the information is distributed to affected populations and the public at large.

14

26.    **Plaintiff ACT** is an organization of immigrants from Africa and their families and a nonprofit with federal 501(c)(3) tax exempt status.  Its mission is to empower African immigrants to integrate socially, get ahead economically, and engage civically.  ACT supports African immigrants nationwide by providing direct services, including pro bono immigration legal services to indigent and underserved African immigrant clients; through leadership development programs, organizing, and civic education; and by advocating for policy reforms that would benefit its members, clients, and constituent communities.  As one of the largest organizations of and for African immigrants in the United States, ACT frequently receives requests for assistance from African migrants and Afro-Caribbean migrants who have recently entered the United States and are seeking asylum, who are in immigrant detention, and who are in removal proceedings, as well as requests for support from the lawyers and community organizations who represent them.  ACT attempts to respond to these requests for assistance to the best of its ability and within its available resources.  ACT will use the information responsive to these FOIA requests to serve members, clients, and constituent communities affected by the information, including the refugees from Ethiopia, the Democratic Republic of Congo, and other African countries who were expelled from Del Rio, Texas, in September 2021 as well as migrants who continue to seek asylum in the United States every day, including those who present at the U.S.-Mexico border.

27.    **Plaintiff UBN** is a nonprofit organization with federal 501(c)(3) tax exempt status.  UBN serves as a multigenerational network of currently and formerly undocumented Black people that aims to foster community, facilitate access to resources, and transform the realities of undocumented Black people, so that they are thriving and living their fullest lives.  UBN believes that directly impacted people should be at the center of the decisions impacting their lives and takes strategic direction and advice from its membership.  As such, UBN develops leadership

among its members by developing tools, training, and programming.  UBN builds power with and

for communities through advocacy, local organizing, and strategic alliances to achieve policy

goals.  UBN centers the humanity, dignity, and wellbeing of its members and community in all

aspects of its work.  UBN is committed to ensuring government accountability, especially with

regard to the government's actions in relation to undocumented Black people, and will work with

other non-profit and advocacy groups to ensure that the information responsive to these FOIA

requests is distributed to affected populations and the public at large.

28.     **Defendant DHS** is an agency of the U.S. government within the meaning of 5

U.S.C. § 551, 5 U.S.C. § 552(f), and 5 U.S.C. § 702.  DHS has possession, custody, and control of

the records that the Plaintiffs seek, including through its component offices CBP and ICE.

29.     **Defendant CBP** is a component of DHS and an agency of the U.S. government

within the meaning of 5 U.S.C. § 551, 5 U.S.C. § 552(f), and 5 U.S.C. § 702.  CBP has possession,

custody, and control of the records that Plaintiffs seek.

30.     **Defendant ICE** is a component of DHS and an agency of the U.S. government

within the meaning of 5 U.S.C. § 551, 5 U.S.C. § 552(f), and 5 U.S.C. § 702.  ICE has possession,

custody, and control of the records that Plaintiffs seek.

31.     **Defendant BOP** is an agency of the U.S. government within the meaning of 5

U.S.C. § 551, 5 U.S.C. § 552(f), and 5 U.S.C. § 702.  BOP has possession, custody, and control of

the records that Plaintiffs seek.

## STATUTORY FRAMEWORK

32.     FOIA requires that federal agencies promptly release, upon request by a member

of the public, documents and records within the possession of the agency, unless a statutory

exemption applies.  5 U.S.C. § 552(a)–(b).

33.    Within twenty business days of an agency's receipt of a FOIA request, the agency must "determine . . . whether to comply" with the request.  5 U.S.C. § 552(a)(6)(A)(i).  The agency must "immediately notify" the requester of "such determination and the reasons therefor."  *Id.*  If an agency determines that it will comply with the request, it must "promptly" release responsive, non-exempt records to the requester.   5 U.S.C. § 552(a)(6)(C)(i).  If the agency fails to comply with the statutory time limits, the requester is deemed to have exhausted her administrative remedies.  *Id.*

### FACTS RELATING TO PLAINTIFFS' FOIA REQUESTS AND DEFENDANTS' RESPONSES

34.    On October 1, 2021 and February 25, 2022, Plaintiffs submitted FOIA requests to Defendants for records relating to the agencies' treatment of migrants in or around Del Rio, Texas in September 2021 and the investigation that followed.  None of the Defendants have satisfied their FOIA obligations in response to the requests.

### A.    Plaintiffs' October 1, 2021 Requests and Defendants' Responses

35.    On October 1, 2021, Plaintiffs sent a FOIA request (Exhibit A) to Defendants DHS, CBP, ICE, and BOP.  The request sought several categories of records, including records relating to Defendants' treatment of the 15,000 migrants in Del Rio, Texas; actions taken to determine whether migrants should be removed or expelled; and coordination between law enforcement agencies and with other countries to respond to the migrants.

36.    The October 1, 2021 request sought all responsive records created since September 1, 2021, or showing certain data for the month of September 2021.

37.    Plaintiffs additionally sought a fee waiver because "disclosure of the information . . . is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest" of the Plaintiffs.  *See* 5 U.S.C. §

552(a)(4)(A)(iii).  Plaintiffs are nonprofit organizations with no private commercial interest in the records requested and will make all responsive records available to the public at no charge.

### *October 2021 Requests to DHS*

38.    Having received no communication from DHS following the expiration of the applicable time-limit provisions of FOIA, Plaintiffs sent an e-mail to DHS on November 23, 2021 seeking an update.  DHS did not respond.

39.    Nearly two months later, on January 21, 2022, Plaintiffs again e-mailed DHS seeking an update.

40.    On January 21, 2022, DHS e-mailed Plaintiffs stating that it had issued, via e-mail, an acknowledgment letter on December 9, 2021, and assigned the request tracking number 2022-HQFO-00138.  It further stated it required more information.

41.    On January 24, 2022, Plaintiffs responded that they had not received the December 9, 2021 letter nor did it appear in the DHS FOIA account.  (The December 9 letter appears to have been sent to an incorrect e-mail address.)

42.    On January 28, 2022, DHS again acknowledged the FOIA request via e-mail.  In an attached letter, DHS stated that it had determined the request "is too broad in scope or did not specifically identify the records which [Plaintiffs] are seeking."  It asked Plaintiffs to resubmit the request "containing a reasonable description of the records" sought and asserted that it would administratively close the request if it did not receive a response within 30 days of the letter.

43.    Plaintiffs responded to the letter on March 8, 2022, within 30 working days of DHS's letter, as required by 6 C.F.R. § 5.3(c).  Plaintiffs explained that the served request was neither too broad nor insufficiently specific because, among other things, the request was time-bound, situation-bound, and location-bound as it related to responsive documents created since September 2021 about migrants in Del Rio in September 2021.  Further, Plaintiffs noted that, per

6 C.F.R. § 5.3(b), DHS should have informed Plaintiffs what additional information is needed. Plaintiffs requested that DHS process the request as submitted or provide further guidance.

44.    On May 12, 2022, Plaintiffs again followed up with DHS via letter, explaining that the FOIA request had been in DHS's possession for more than seven months and that DHS had never responded to Plaintiffs' March 8, 2022 letter.

45.    Plaintiffs have not received any further communication regarding the October 1, 2021 request to DHS.  DHS did not determine whether it will comply with Plaintiffs' request, and indeed updated the status of Plaintiffs' request to "Closed" on the agency's online FOIA portal without sending Plaintiffs a notification.

### *October 2021 Requests to CBP*

46.    On October 1, 2021, CBP acknowledged receipt of the FOIA request via e-mail, and assigned it request number CBP-2022-000314.

47.    On October 7, 2021, CBP responded to Plaintiffs' request for a fee waiver via e-mail, stating that Plaintiffs' request for a fee waiver "for the FOIA request CBP-2022-000314 has been determined to be not applicable as the request is not billable."  It is unclear whether this response meant to convey that CBP had denied the fee waiver, or rather that the imposition of any fee was inapplicable.

48.    On October 14, 2021, Plaintiffs responded to the e-mail asking for clarification about the fee waiver decision and noting that Plaintiffs' FOIA request remained pending.  Plaintiffs received notification that their e-mail had not been delivered.

49.    On October 14, 2021, CBP again acknowledged receipt of the FOIA request via letter.

50.    Plaintiffs have not received any further communication regarding the October 1, 2021 request to CBP.

*October 2021 Requests to ICE*

51.     On May 3, 2022, ICE acknowledged receipt of the request via e-mail and assigned it request #2022-ICFO-13792.

52.     On May 9, 2022, ICE again acknowledged receipt of the request via e-mail and assigned it tracking #2022-ICFO-15152.

53.     On June 21, 2022, Plaintiffs drew ICE's attention to the fact that there appeared to be two tracking numbers assigned to their single request and requested an update on the processing of that request.

54.     On June 23, 2022, ICE closed #2022-ICFO-15152 as a duplicate request.

55.     Plaintiffs have not received any further communication regarding the October 1, 2021 request to ICE.

*October 2021 Requests to BOP*

56.     On October 4, 2021, BOP responded that it had determined that the FOIA request could not be processed because the records sought were not BOP records or because the request did not indicate that BOP records were sought.

57.     On October 7, 2021, Plaintiffs responded with an explanation that BOP's response appeared to be erroneous and directed the agency's attention to an article in which a BOP spokesperson confirmed the agency's role in transporting migrants from Del Rio in September 2021, and therefore the subject matter of the request.  Plaintiffs requested that BOP reconsider its determination in light of this information.

58.     On October 8, 2021, BOP acknowledged receipt of the FOIA request and assigned it request number 2022-00172.  BOP also extended the time limit to respond to Plaintiffs' request "for the ten additional days provided by the statute."

59.     On February 2, 2022, Plaintiffs sought an update from BOP on the status of their request.

60.     On February 3, 2022, BOP sent Plaintiffs a determination letter and made a partial production of records, consisting of a single 32-page document.  BOP stated that a search was "still being conducted for electronic correspondence responsive to [Plaintiffs'] request" and informed Plaintiffs that they would "receive a final response regarding the remainder of [the] request."

61.     On June 22, 2022, Plaintiffs asked BOP for an update on the status of their request following the partial release of records.

62.     On July 5, 2022, BOP responded that it was still processing Plaintiffs' request.

63.     On July 14, 2022, Plaintiffs again sought an update from BOP on the status of their request.

64.     On September 7, 2022, Plaintiffs again sought an update from BOP.

65.     On September 7, 2022, BOP responded that it had "finished processing the records in early August" and attorney review was complete. The BOP further stated that "[t]here were records that had to be sent to the United States Marshal Service, Justice Management Division, and the Department of Homeland Security for consultation" and that it was "still awaiting the consultation response from USMS and DHS before [it could] release the records."

66.     On September 22, 2022, Plaintiffs again sought an update from BOP.

67.     On September 26, 2022, BOP responded that both USMS and DHS had acknowledged receipt of the consultations.  BOP further stated that "[n]either [USMS or DHS] gave [BOP] an estimated date of completion on the records, but that is not unusual."  In addition,

BOP stated that it did "not anticipate them getting the records back to [BOP] this week" and was "hopeful they will get the records back to [BOP] next month."

68.     Plaintiffs have not received any further communication or records from BOP regarding the October 1, 2021 request.

**B.     Plaintiffs' February 25, 2022 Requests and the Responses from DHS and CBP**

69.     On February 25, 2022, Plaintiffs sent a FOIA request (Exhibit B) to Defendants DHS and CBP, seeking records related to or reflecting how the government investigated its own September 2021 response, including investigation of DHS policies, decision-making, or personnel related to treatment of asylum-seeking individuals.

70.     Plaintiffs additionally sought a fee waiver because "disclosure of the information . . . is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest" of the Plaintiffs.  *See* 5 U.S.C. § 552(a)(4)(A)(iii).  Plaintiffs are nonprofit organizations with no private commercial interest in the records requested and will make all responsive records available to the public at no charge.

### *February 2022 Requests to DHS*

71.     On March 17, 2022, DHS conditionally granted Plaintiffs' request for a fee waiver, and assigned the FOIA request # 2022-HQFO-00674.  DHS also "invoke[d] a 10-day extension" for the request "pursuant to 6 C.F.R. Part 5 § 5.5(c)."

72.     Plaintiffs have not received any further communication regarding the February 25, 2022 request to DHS.

### *February 2022 Requests to CBP*

73.     On March 1, 2022, CBP denied Plaintiffs' fee waiver request via e-mail, despite its being identical to the request made to and granted by DHS.  The e-mail acknowledged Plaintiffs'

request was created on February 25, 2022 and assigned the FOIA request tracking number CBP-IA-2022-047980.

74.    On May 10, 2022, Plaintiffs appealed CBP's denial of the fee waiver request.  CBP confirmed via e-mail receipt of the appeal and assigned it tracking number CBP-2022-076342.

75.    On June 8, 2022, CBP conditionally granted the fee waiver request on appeal, referring to the request by a different tracking number (CBP-AP-2022-078470).  It also appeared to refer to the original FOIA request with a slightly different tracking number (CBP-OC-2022-047980).

76.    On June 30, 2022, CBP provided a second response to the May 10, 2022 fee waiver appeal, determining that the fee waiver for CBP-2022-076342 was determined to be "not applicable as the request is not billable."

77.    Plaintiffs have not received any further communication regarding the February 25, 2022 request to CBP.

*    *    *

78.    Defendants DHS, ICE, and CBP have still not communicated to Plaintiffs if they have determined whether they will comply with Plaintiffs' requests and have still not produced a single document.  All Defendants' responses are now many months late.  Migrants presenting at the U.S.-Mexico border every day, their families, and the general public have an urgent need for this information.

## CLAIMS FOR RELIEF

### CLAIM I
### Violation of FOIA, 5 U.S.C. § 552
### Failure to Conduct Adequate Searches for Responsive Records and Prompt Production

79.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

80.    Plaintiffs properly requested records within the possession, custody, and control of Defendants.

81.    Defendants are agencies subject to and within the meaning of FOIA, and they must therefore make reasonable efforts to search for requested records and promptly produce them.

82.    Defendants have failed to promptly review agency records for the purpose of locating those records that are responsive to the Plaintiffs' FOIA requests.

83.    Defendants' failure to conduct adequate searches for responsive records and promptly produce such records violates FOIA and applicable regulations.

84.    Because Defendants failed to comply with the applicable time-limit provisions of FOIA, Plaintiffs constructively exhausted administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i).

85.    Plaintiffs are therefore entitled to injunctive and declaratory relief requiring Defendants to promptly make reasonable efforts to search for records responsive to Plaintiffs' FOIA requests and to produce them.

### CLAIM II
### Violation of FOIA, 5 U.S.C. § 552
### Wrongful Withholding of Non-Exempt Responsive Records

86.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

87.    Plaintiffs properly requested records within the possession, custody, and control of Defendants.

88.    Plaintiffs have a legal right under FOIA to the timely search and release of non-exempt agency records responsive to their requests.

89.    Defendants are agencies and components thereof subject to FOIA, and they must therefore release in response to a FOIA request any non-exempt records and provide a lawful reason for withholding any information.

90.    Defendants are wrongfully withholding non-exempt agency records requested by Plaintiffs by failing to produce non-exempt records responsive to their FOIA requests.

91.    Defendants are wrongfully withholding non-exempt agency records requested by Plaintiffs by failing to segregate exempt information in otherwise non-exempt records responsive to Plaintiffs' FOIA requests.

92.    Defendants' failure to provide all non-exempt responsive records violates FOIA.

93.    Because Defendants failed to comply with the applicable time-limit provisions of FOIA, Plaintiffs have constructively exhausted administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i).

94.    Plaintiffs are therefore entitled to declaratory and injunctive relief requiring Defendants to promptly produce all non-exempt records responsive to their FOIA requests and provide *Vaughn* indexes justifying the withholding of any responsive information withheld under claim of exemption, with judicial review of any claimed exemptions.

## CLAIM III
### Violation of FOIA, 5 U.S.C. § 552
### Wrongful Denial of Statutory Fee Waiver

95.     Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

96.     FOIA requires Defendants to provide records at no charge or at reduced charge "if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii).

97.     Plaintiffs have requested records relating to Defendants' role in the treatment of the 15,000 migrants in Del Rio, Texas, in September 2021, including Defendant CBP's actions.  In addition, Plaintiffs sought information about how the government investigated its own September 2021 response, including investigation of CBP policies, decision-making, or personnel related to treatment of individuals seeking asylum.

98.     Plaintiffs are requesters with no commercial interest in the records sought and will make all responsive records available to the public at no charge.

99.     In addition, an agency "shall not assess any search fees" if it fails to comply with the time limits in subparagraph 6 of FOIA, including the time limit to "determine within 20 days . . . after the receipt of any such request whether to comply with such request."   5 U.S.C. § 552(a)(4)(A)(viii); § 552(a)(6)(A)(i).

100.    Plaintiffs are thus eligible for a fee waiver under 5 U.S.C. § 552(a)(4)(A)(iii) and, in any event, entitled to a fee waiver under 5 U.S.C. § 552(a)(4)(A)(viii).

101.    Therefore, to the extent CBP or any Defendant has denied or intends to deny Plaintiffs' requests for fee waivers, Plaintiffs are entitled to declaratory and injunctive relief

requiring Defendants, including CBP, to grant a full waiver of all fees associated with Plaintiffs'
FOIA requests.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

a.    Declare unlawful Defendants' failure to comply with FOIA;

b.    Declare that Plaintiffs are entitled to disclosure of the requested records;

c.    Order Defendants to immediately process Plaintiffs' requests in accordance with 5
U.S.C. § 552 and to disclose, in their entirety, unredacted versions of all records
responsive to Plaintiffs' requests that are not specifically exempt from disclosure
under FOIA, including any non-identical copies of any such records;

d.    Enjoin Defendants to grant a full waiver of all fees associated with Plaintiffs'
requests;

e.    Enjoin Defendants from charging Plaintiffs search, review, or duplication fees of
the processing of the requests;

f.    Enjoin Defendants from continuing to withhold any and all non-exempt records
responsive to Plaintiffs' requests;

g.    Retain jurisdiction of this action to ensure that no agency records are wrongfully
withheld, including, if necessary, judicial review of any claim by a Defendant that
requested information is exempt from disclosure;

h.    Award Plaintiffs their reasonable attorney's fees and litigation costs incurred in this
action, pursuant to 5 U.S.C. § 552(a)(4)(E) and/or 28 U.S.C. § 2412(d)(1)(A); and

i.    Grant such other relief as the Court may deem just and proper.

DATED: September 30, 2022                Respectfully submitted,


                                         /s/ *Stephen J. Fuzesi*
                                         Stephen J. Fuzesi (Bar No. SF2000)
                                         Sara Fatima Dhanji *(pro hac vice to be filed)*
                                         WILLIAMS & CONNOLLY LLP
                                         680 Maine Avenue, SW
                                         Washington, DC 20024
                                         Telephone: (202) 434-5000
                                         Facsimile: (202) 434-5029
                                         Email: sfuzesi@wc.com
                                                  sdhanji@wc.com

                                         For Matters in New York:
                                         WILLIAMS & CONNOLLY LLP
                                         650 Fifth Avenue
                                         Suite 1500
                                         New York, NY 10019

                                         Lauren Michel Wilfong (*application for admission
                                         pending*)*
                                         Karen C. Tumlin (*pro hac vice to be filed*)
                                         Jane Bentrott (*pro hac vice to be filed*)
                                         JUSTICE ACTION CENTER
                                         P.O. Box 27280
                                         Los Angeles, CA 90027
                                         Telephone: 323-536-3850
                                                    323-316-0944
                                                    323-504-3165
                                         Email: lauren.wilfong@justiceactioncenter.org
                                                  karen.tumlin@justiceactioncenter.org
                                                  jane.bentrott@justiceactioncenter.org
                                         *Not admitted to practice in California

                                         Stephen W. Manning (*pro hac vice to be filed*)
                                         Tess Hellgren (*pro hac vice to be filed*)
                                         Allison Crennen-Dunlap (*pro hac vice to be filed*)
                                         INNOVATION LAW LAB
                                         333 SW 5th Ave., Suite 200
                                         Portland, OR 97204
                                         Telephone: 503-922-3042
                                         Facsimile: 503-882-0281
                                         Email: stephen@innovationlawlab.org
                                                  tess@innovationlawlab.org
                                                  allison@innovationlawlab.org

28

Sarah T. Gillman (Bar No. SG 9273)
Sarah E. Decker (*application for admission pending*)
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine Street
New York, New York 10005
Telephone: 347-977-7457
                908-967-3245
Email: gillman@rfkhumanrights.org
          decker@rfkhumanrights.org

*Attorneys for Plaintiffs*