N5p2HaiC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    HAITIAN BRIDGE ALLIANCE, *et
     al.*,
4
                    Plaintiffs,              New York, N.Y.
5
              v.                             22 Civ. 8344 (ER)
6
     U.S. DEPARTMENT OF HOMELAND
7    SECURITY, *et al.*,

8                   Defendants.

9    ------------------------------x          Remote Conference

10                                            May 25, 2023
                                              2:30 p.m.
11
     Before:
12
                         HON. EDGARDO RAMOS,
13
                                             District Judge
14

15                         APPEARANCES

16

17   WILLIAMS & CONNOLLY, LLP
          Attorneys for Plaintiffs
18   BY:  SARA F. DHANJI
          STEPHEN J. FUZESI
19

20
     DAMIAN WILLIAMS
21        United States Attorney for the
          Southern District of New York
22   TOMOKO ONOZAWA
     DANA WALSH KUMAR
23        Assistant United States Attorneys

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

N5p2HaiC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3     the record, starting with counsel for plaintiffs.

4          MS. DHANJI:  Good afternoon, your Honor.  My name is

5     Sara Dhanji, of Williams & Connolly, and I am here on behalf of

6     plaintiff.

7          THE DEPUTY CLERK:  Counsel for defendant.

8          MS. ONOZAWA:  Good afternoon, your Honor.  This is

9     Tomoko Onozawa, from the U.S. Attorney's Office for the

10    Southern District of New York, and with me on the call on

11    behalf of defendants is Dana Kumar.

12         THE COURT:  And good afternoon to you all.

13         This matter is on for premotion conference.  I note

14    for the record that it is being conducted by telephone.

15         I believe that this is the first time that the parties

16    have appeared before me so, Ms. Dhanji——and please let me know

17    if I am mispronouncing that——why don't you begin by telling me

18    what this case is about and where we are so far.

19         MS. DHANJI:  Sure, your Honor.

20         So this case is about two FOIA requests that my

21    clients submitted in October 2021 and February 2022.  The

22    requests were submitted to DHS, CBP, and ICE, and they seek

23    records regarding the treatment of 19,000 migrants who arrived

24    in Del Rio, Texas, in September 2021 and related policies of

25    investigations.

N5p2HaiC

1          The plaintiffs did not receive any records after

2    submitting their FOIA requests, so we filed this lawsuit in

3    September of last year.  In the months that followed, the

4    parties have conferred extensively, and we have actually agreed

5    on the vast majority of the searches to be conducted already.

6    In fact, this week the government confirmed that the agencies

7    are processing all of the agreed-upon portions of the requests.

8          So there actually are only three issues on which the

9    parties have reached an impasse.  All of them are reflected in

10   Exhibit B to our premotion letter, which is Docket No. 46-2.  I

11   can walk through the three issues, your Honor, or we could take

12   a look at that exhibit, if that would be helpful.

13          THE COURT:  I have the exhibit.

14          MS. DHANJI:  Okay.  So the first issue at hand is that

15   the government is refusing to search for DHS Headquarters

16   records in response to the October 2021 FOIA request.  They are

17   asserting that the request would be -- that the search would be

18   futile.  And so you can see, actually, on page 3 of 11 all the

19   way through page 5 of 11 -- or page 6 of 11, rather, that DHS

20   has -- the government has crossed out DHS in all of those

21   requests.  So those are the ones where we are requesting that

22   DHS conduct searches.

23          The government said that searches for these documents

24   listed in these categories would be futile, but that is

25   actually not the case.  The events in Del Rio were front page

N5p2HaiC

1    news.  This was the largest mass migration in U.S. Border

2    Patrol's recorded history.  And there are many public documents

3    that show that DHS Headquarters was extensively involved in the

4    events in Del Rio, and we actually cited several of them in our

5    letters to your Honor.  So we believe the government should be

6    ordered to search for those DHS Headquarters records.  That's

7    the first issue.

8                THE COURT:  Let me go to Ms. Onozawa.

9                Ms. Onozawa, why would those searches or that search

10   be futile?

11               MS. ONOZAWA:  Right.  So as we have explained in our

12   two premotion letters before the Court, this proposal, which is

13   in exhibit -- document 46-2, this memorializes the three DHS

14   defendants' best efforts to narrow down the large universe of

15   documents that plaintiffs initially sought through their

16   October 2021 request, and they were drafted and tailored in

17   mind with the likelihood that a particular DHS defendant would

18   have that record.

19               When we are talking about DHS, we are not talking

20   about the entire agency.  Obviously there are many components

21   and subcomponents who are named as separate -- two of whom are

22   named as separate defendants in this case.  The DHS we are

23   referring to here is DHS Headquarters, which is a small office.

24   It is certainly not the size of CBP and ICE.  And as we have

25   explained in detail in our May 19 letter, DHS Headquarters has

N5p2HaiC

1    considered these requests and it has determined that the

2    records specifically sought here——which is policies,

3    procedures, directives, formal guidance, formal reports, and

4    memoranda——regarding specific events in the Del Rio sector in

5    September 2021 would not be created or issued by that office.

6    It would have been -- the particulars that plaintiffs are

7    seeking here would have been handled by the components that

8    have agreed to undertake these searches, in this case CBP and

9    ICE.

10         We are prepared to, on summary judgment, submit a more

11   detailed declaration to this effect, but it is DHS

12   Headquarters' strong view that searching for the particular

13   reports, memoranda, policies, and guidance that plaintiffs are

14   seeking here would be futile because DHS would not have created

15   or issued such documents.

16         THE COURT:  Okay.  Ms. Dhanji, I will give you an

17   opportunity to respond briefly.

18         MS. DHANJI:  Yes.  Thank you, your Honor.

19         So, you know, Ms. Onozawa mentioned that these -- they

20   have sort of created this proposal and tried to tailor it to

21   the agencies that would be likely to have responsive documents,

22   and I think indeed in their letters they mention that DHS HQ

23   typically would not be involved in responding to day-to-day

24   operations or on-the-ground situations such as the ones that

25   took place in Del Rio.

N5p2HaiC

1           But in fact this was no a typical event, your Honor.

2      This was the largest mass migration event in U.S. border patrol

3      history.  Secretary Alejandro Mayorkas actually visited Del Rio

4      and spoke there about DHS's ongoing efforts on the ground.  In

5      fact, even the White House has recorded a conversation between

6      Secretary Mayorkas and Vice President Harris discussing DHS's

7      efforts at Del Rio in the relevant time period because of the

8      influx of migrants and have also -- you know Secretary

9      Mayorkas, in fact, described this as an all-of-government

10      response to the migrants in Del Rio.

11           In fact, the single CBP document that had been

12      produced to us in response to the FOIA request, which is

13      actually docket 49-1, you can see on pages 9 and 20 there that

14      the CBP report that was issued following September 2021

15      discusses that there were more than 60 DHS personnel, ten

16      Homeland Securities Investigations personnel, and 54 Homeland

17      Securities Investigations special response team personnel, who

18      were actually on the scene at the Del Rio port of entry between

19      September 17 and September 25, 2021, providing support to CBP

20      in their response to Del Rio.

21           So all we are saying is that they should conduct a

22      search.  We are not speculating here.  We have public documents

23      that we are referencing as the evidence to show that DHS HQ

24      possesses the documents.  And we have sort of -- the question

25      is really whether, should they run a search or should they not,

N5p2HaiC

1    would it be futile?  And what we are saying here that they

2    should at least conduct a search because there is evidence in

3    the public domain and from the documents that we have received

4    from CBP that show DHS personnel were extensively involved in

5    the response to Del Rio, both at the leadership level and on

6    the ground at the scene in Del Rio.

7         THE COURT:  Let me just tell you, I am completely

8    unfamiliar with the structure of DHS, so when you say that

9    there were DHS personnel on site at the Del Rio location, as

10   Ms. Onozawa indicated, DHS is made up of a lot of sub-units.

11   Do you know for a fact do the documents that you have in fact

12   submitted establish that there were actually, first -- and I

13   assume that there would be high-level personnel from DHS at

14   that location?

15        MS. DHANJI:  Yes, your Honor.  So we actually have

16   public documents that talk about Secretary Mayorkas actually

17   visiting Del Rio, and he actually delivered remarks while he

18   was there about DHS's ongoing efforts.  But if you have, your

19   Honor, Docket No. 49-2 pulled up, if you flip to page 9 of 32

20   there, you will see there is actually a distinction between the

21   different departments.  You know, this is a CBP report.  They

22   talk about CBP.  They talk about ICE separately.  But under

23   section F on page 9, the Department of Homeland Security

24   volunteer force and the Homeland Security Investigations

25   special response team is called out by name.  It is sort of

N5p2HaiC

1    distinguished from the other subcategories of agencies that are

2    listed in that document.

3              THE COURT:  I'm sorry.  Was that document submitted

4    under seal?  Because I have document 49, and there is only

5    one --

6              MS. DHANJI:  Oh.  My apologies, your Honor.  It is

7    actual docket 49-1.

8              THE COURT:  Okay.

9              MS. DHANJI:  Apologies, your Honor.

10             THE COURT:  Okay.  And what page did you --

11             MS. DHANJI:  Page 9 of that report, 9 of 32.

12             THE COURT:  Okay.

13             So, Ms. Onozawa, you indicated that DHS is a small

14    office.  Why would, first of all, conducting a search using the

15    agreed-upon terms constitute a burden?

16             MS. ONOZAWA:  So if I may respond to a few points that

17    Ms. Dhanji has raised.

18             So the fact that Secretary Mayorkas was on the scene

19    and made public statements and spoke to the media does not

20    prove or show that DHS Headquarters was -- had created or

21    issued specific policies, procedures, formal reports, or

22    memoranda on the issue.

23             Ms. Dhanji had cited HSI and the volunteer force.  HSI

24    is a component of DHS.  It stands for Homeland Securities

25    investigations, which is not a part of headquarters.  The DHS

N5p2HaiC

1    volunteer force is an interagency group of federal employees

2    who have volunteered to be detailed to DHS to help out in

3    certain operational activities.  It is not the same. . .

4              (Call dropped)

5              THE COURT:  I think, Ms. Onozawa, you were speaking so

6    you can continue.

7              MS. ONOZAWA:  Yes.  Thank you, your Honor.

8              So the other point I wanted to raise, and we have

9    noted this in our last letter to the Court, which is that DHS

10   has continued to agree to conduct searches for the five

11   subparts in plaintiffs' February 2022 request, and DHS has also

12   agreed to search the e-mail communications of four custodians

13   for records -- for e-mail communications relating to what

14   happened at the Del Rio sector.

15             So it's not that we are saying that DHS has nothing,

16   we have just taken a close look at our proposal and have agreed

17   to search for the records that DHS is certain that it would

18   have or is likely to have.

19             THE COURT:  Okay.  Thank you.

20             Ms. Dhanji, do you want to talk about your second

21   issue?

22             MS. DHANJI:  Yes, your Honor.  Thank you.

23             The second issue relates to search terms, custodians,

24   and time periods.  So the parties spent the last few months

25   negotiating, at plaintiffs' requests, for all the documents

N5p2HaiC

1    that hit on specific search terms for specific custodians and

2    specific time periods, and we are agreed on all the custodians,

3    save one.  So we are really talking about terms and time

4    periods here.

5         The government, after these negotiations kept going on

6    for a few months, abruptly rejected that approach on May 2, but

7    this week has represented that it is willing to engage in

8    further negotiations on the search terms, but told us yesterday

9    that they won't agree to do so if we are also moving forward

10   with summary judgment on this issue.

11        So our position is that we should still schedule a

12   summary judgment briefing schedule but work in time for these

13   negotiations.  So we would therefore ask the Court for two

14   things:

15        So, first, we propose that the Court set June 29 as

16   the date for the parties' opening briefs, which is about five

17   weeks from now.  That will give us a deadline to work towards

18   to resolve this issue and will also avoid the need for us to

19   appear before the Court again to discuss search terms

20   specifically.

21        Second, to facilitate the negotiations, the plaintiffs

22   have asked the government to provide search term hit reports

23   and information regarding what document review platform the

24   agencies are using, whether they are deduplicating their

25   documents, whether they are threading the search term hits,

N5p2HaiC

1    information like that.

2          We have also asked that agency counsel attend our

3    negotiations to make our discussions as productive as possible.

4          So the second thing that we would ask is that the

5    government should be ordered to provide that information by the

6    end of next week just to ensure we are staying on track with

7    our negotiations and to have agency counsel join those calls so

8    that we can work in the two weeks of time for negotiations and

9    still have ample time to brief the issue if we need to by June

10   29.

11         THE COURT:  Ms. Onozawa, any objection to that?

12         MS. ONOZAWA:  Several, yes.  We have a different view.

13         So I just wanted to clarify, our sort of understanding

14   of how this transpired is that on May 16, three days before the

15   parties filed their second PMC letters, I spoke with

16   Ms. Dhanji, who said the plaintiffs will drop the objected to

17   portions of the October 2021 requests if we agree to run the

18   e-mail search terms that are set forth in Exhibit A of

19   plaintiffs' opening premotion letter.  We have relayed to

20   plaintiffs that we can't agree to their proposed search terms

21   but we were willing to engage in further discussions about

22   them.  We just don't think it makes sense to do so if we are

23   also moving ahead with summary judgment briefing on this issue

24   at the same time.

25         While plaintiffs informed us right before this call

N5p2HaiC

1    that they want to keep the summary judgment briefing on the

2    calendar while engaging in further discussions on the search

3    terms at the same time, we just don't think that's the most

4    efficient approach here.  As Ms. Dhanji has just laid out,

5    plaintiffs are asking for a lot of information from the agency,

6    which we are willing to provide, but it can't happen overnight

7    and we just don't think it can happen by the end of next week.

8    It requires a tremendous amount of agency resources that need

9    to be balanced in light of other FOIA litigations and civil

10   discovery obligations that also involve electronic searches.

11          We also don't think it makes sense to keep the summary

12   judgment briefing deadline if we are also negotiating on a fast

13   track search terms because we have to be in this awkward

14   position of having to prepare supporting declarations and

15   prepare briefing on an evolving dispute which may well change

16   several times in the course of negotiations up to the point of

17   briefing.

18          And then the other thing I wanted to point out is

19   Ms. Dhanji noted that June 29 should be the deadline for both

20   parties' opening briefs.  It is our burden to demonstrate in

21   the first instance that these issues, including the search

22   terms, should be resolved in our favor, and we intend to

23   submit, as I mentioned, one or more agency declarations to

24   support our positions, which plaintiffs would then, upon seeing

25   them, be free to respond to.  So if briefing is going to

N5p2HaiC

1    happen, it should proceed sequentially, with the government

2    moving first, the plaintiffs filing cross motions and

3    oppositions, government files its opposition and reply, and

4    then the plaintiffs can reply.

5        THE COURT:  Can I ask, I understood——maybe I

6    misheard——Ms. Dhanji to say not that you would turn over

7    documents within a week, but that negotiations continue to see

8    whether an agreement can be reached.  Did you understand that

9    differently?

10        MS. ONOZAWA:  We are open to negotiations continuing

11    for certain.  Look, a negotiated resolution is better than

12    litigating the issue.  The thing is, and this is the reason why

13    we were unable to continue these negotiations, is that it just

14    doesn't make sense from both an agency resource and an attorney

15    resource standpoint to try to do both.  Negotiating search

16    terms takes a lot of internal agency effort.  It is not just a

17    matter of pushing a button and running some search terms.

18    There is actually more of a process involved depending on which

19    component you are dealing with.

20        So to the extent we are going to focus our efforts on

21    negotiations, we are completely on board with that.  We just

22    don't think it makes sense to keep a summary judgment briefing

23    deadline of June 29 on the calendar as well.

24        THE COURT:  And I take it that we are only talking

25    about this category of documents and that the parties are sort

N5p2HaiC

1    of entrenched in their positions with respect to the first

2    category of documents that we discussed.  Is that right,

3    Ms. Onozawa.

4              MS. ONOZAWA:  The DHS records search?

5              THE COURT:  Yes.

6              MS. ONOZAWA:  Yes.  I just don't see compromise there.

7              THE COURT:  Okay.

8              And what is the third category, Ms. Dhanji.

9              MS. DHANJI:  Your Honor, the third category can be

10   described briefly but it actually covers a couple of pages in

11   docket 46-2.  And you will see this starts on page 5 of 11 of

12   docket 46-2 and goes all the way through page 7 of 11 in docket

13   46-2.

14             So these are specific requests that plaintiffs made

15   for key information and data concerning the events in Del Rio.

16   The government -- we proposed these a couple of times, and the

17   government has rejected almost all of them twice already.  The

18   government claims that these requests are for unreasonably

19   broad categories of documents, but even a quick review of those

20   requests shows that they are detailed and granular.  They are

21   all tied to a specific location, a specific time period, and

22   they look to specific topics.

23             So, for example, at the bottom of page 5 of 11 there

24   is a request, rejected request no. (6)(e), which asks for

25   records reflecting between September 1 and September 25 the

N5p2HaiC

1   types of documents collected from or returned to migrants in

2   Del Rio.

3          And then if we flip to the next page, we look at

4   rejected request number (7)(b).  That one asks for when and how

5   use of force techniques, restraints, and weapons were used in

6   Del Rio between September 1 and September 25.

7          So these requests are very limited to specific topics,

8   they are very exacting in detail, and we believe the agency

9   should be ordered to process them.

10          THE COURT:  Ms. Onozawa.

11          MS. ONOZAWA:  So obviously we have a different view.

12          First of all, with respect to (6), we haven't rejected

13   it wholesale.  We have modified it in a way that the agencies

14   believe it can search for the records.

15          But incidentally, much of what plaintiffs are seeking

16   are already -- should already be captured by other requests

17   which the agencies have agreed to search for and process.  So

18   for example, (6)(a) or rather (6)(b), which has been deleted,

19   asks the agency to count how many times CBP and ICE provided

20   water, housing or shelter, medical care, sanitation facilities,

21   hygiene products, diapers, baby food, and formula.  That would

22   essentially, for example, require the agency to turn over any

23   existing medical records for any or all of the 15 or, I guess,

24   as Ms. Dhanji said, 19,000 migrants who were in the Del Rio

25   sector in September of 2021.

N5p2HaiC

1          We have modified that to reflect the total volumes or

2     quantities of food, water, housing, etc., that were provided

3     because the agency or one of the agencies believes that it

4     would have tracked that.

5          The other thing to point out is that the deleted

6     portions of (a) and (b) are already sort of reflected in the

7     information that the agencies agreed to provide in request

8     numbers (1)(a), (1)(b), and (2)(d) which appear in the first

9     half of document 46-2.

10         I could go on, but I think, you know -- sorry, so also

11     the types of documents collected from or returned to migrants

12     in Del Rio, given to migrants in Del Rio, and created during

13     processing of migrants in Del Rio, that is also broad and

14     burdensome because, among other things, if a migrant sought an

15     immigration benefit or if a decision was made to remove a

16     migrant, for example, that would have led to the creation of an

17     alien file.  And so what essentially this is calling for is the

18     creation -- all alien files relating to migrants that were in

19     Del Rio during the month of September 2021.  And many of these

20     requests are already captured in request Nos. 1 and portions of

21     2 that we have agreed to search for.

22         THE COURT:  Ms. Dhanji, what about that?  Also, can

23     you explain to me, I'm trying to figure out exactly are you

24     asking how many actual diapers were given to how many actual

25     migrants during this I assume was a fairly chaotic time?

N5p2HaiC

1          MS. ONOZAWA:  Yes, your Honor.  We actually -- we do

2     believe that the government was keeping track of this

3     information.  If your Honor looks to the one document that's

4     been produced to us by CBP, which is document no. 49-1, you

5     will see, for example, on page 8 of 32 at the very bottom,

6     letter J, there is actually like a tracking of how many

7     Porta Pottis were available, how many hand-washing stations,

8     how many bulk trash bins.  And on the following page there are

9     also statistics under (m), for example, that talk about the

10    number of calls for assistance to evaluate and treat migrants,

11    the number of babies that were delivered at the port of entry,

12    and the ten others that were born at local hospitals.  So this

13    information --

14         THE COURT:  I guess, Ms. Dhanji, how many babies were

15    born, that I can see someone having kept track of, but, you

16    know, giving like a razor or a diaper or a meal to a particular

17    person, is that the kind of -- is that the level of specificity

18    that you are asking for?  I can't imagine that that would have

19    been tracked.

20         MS. DHANJI:  Your Honor, I think that that is the

21    specificity that we are looking for, but we are not asking

22    for -- I think what I want to clarify is that we are not asking

23    for every document that was ever created related to these

24    matters.  We are asking for, like, the total amount or, like,

25    how much.  So how much is, like, give us the total number.  And

N5p2HaiC

1    it does look like they tracked that kind of information.

2          I want to clarify, though, that Ms. Onozawa made it

3    seem as though we are asking for medical records, but that

4    seems to be, like, we have sort of explained this a couple of

5    times on meet-and-confers, that we are not looking for medical

6    records for any of these migrants.  We are also definitely not

7    asking for any A files, and we have made that pretty clear

8    because we don't want this information to be -- we are looking

9    for, for example, if we go back to (6)(e), Ms. Onozawa made it

10   sound as though we were trying to seek medical files underneath

11   this request.  But actually what we are asking for is the types

12   of documents collected.  We are not asking for copies of those

13   documents.  We just want to know what were the types of

14   documents that were collected from migrants or given to

15   migrants.  We are not asking for copies of each and every

16   single document that was created.

17          And in addition, she mentioned that some of these

18   requests are already covered under A(1), but this is a

19   discussion we had had with them before.  A(1) actually goes

20   through policies and procedures and guidance that was in effect

21   at the time, whereas (6) and (7) are asking what actually

22   happened, so not what the policy was but, rather, what actually

23   happened.  So for example if (1)(b) asked for the manner in

24   which CBP and/or ICE was required to record the provision of

25   food, (6) will actually ask and how much was actually tracked.

N5p2HaiC

1    So there is a difference between the two, and that's what we

2    are sort of trying to get at, which is why they are in two

3    different categories.  One asks for the policies and directives

4    and the other one asks for the total amounts and the tracking

5    of such.

6          So I just wanted to make it clear that we really

7    aren't looking for medical records, we are not looking for A

8    files.  Really we are looking for pretty specific information

9    that we do believe was tracked, and we have sort of seen that

10   tracking reflected in the single CBP document that was provided

11   to us.  And we are just sort of -- the way we wrote these in

12   our initial proposal was to try and get at those specific items

13   without burdening the agency, because we really are just trying

14   to get at the data and we are not trying to get every copy of

15   every document that exists.  In fact, the way that these were

16   originally drafted by plaintiff was the lead-in sentence to

17   these actually just said "documents sufficient to show the

18   following things," but the government rejected that

19   formulation, which is how it eventually became the current

20   formulation that says "records reflecting the following

21   information."

22         THE COURT:  Ms. Onozawa, why would it be burdensome or

23   otherwise difficult to say, you know, during these three weeks

24   we gave out -- we distributed X number of boxes of whatever

25   items, whether they be feminine hygiene products or diapers or

N5p2HaiC

1    razors or whatnot?

2          MS. ONOZAWA:  Right.  So if you look at document 46-2,

3    page 4, (6)(a), and I realize the redlines make it hard to

4    read, but we did agree to provide the total volumes or

5    quantities of food, water, housing or shelter, medical care,

6    including COVID-19 vaccinations and testing, sanitation

7    facilities, hygiene products, diapers, baby food, and formula.

8    What we did strike out was the total number of requests made by

9    migrants or how much the agency provided of and how many times

10    the agency provided each of the following.

11          So just let me take an example.  If you wanted to

12    record how many times the agency provided a particular migrant

13    with medical care, you would have to pull the migrant's medical

14    record.  Ms. Dhanji also said that they are not looking for the

15    agency to turn over each and every document that was created,

16    but if you look at (6)(e) which was stricken out at the bottom

17    of page 4, plaintiffs' request, as drafted, seeks records

18    regarding the following data: between September 1, 2021 and

19    September 25, 2021, the types of documents that were created

20    during the processing of migrants in Del Rio.  We have no other

21    choice but to read that as a request for any migrant A files

22    that were created during that time period.

23          And I could keep going, but these requests are simply

24    broad.  We have no choice but to interpret them as seeking

25    everything just because of the way they are written.  And to

N5p2HaiC

1    the extent your Honor, as you asked, if we can provide

2    aggregate data, we have agreed to do that to the extent we

3    track it.

4            THE COURT:  Can I ask a question?  What is a colored

5    paper ticket.

6            MS. DHANJI:  Yes, your Honor.  We have some

7    information that colored paper tickets were issued to the

8    migrants as they were arriving at the border, so it is just an

9    example of one of the documents that we are sort of seeking,

10   like the types of documents, so this is one example of a

11   record.

12           THE COURT:  I'm sorry, but I have no idea what a

13   colored paper ticket is.  What is that?  Is that a term of art?

14           MS. DHANJI:  Yes, your Honor.  It is the way that we

15   have seen it referenced in public documents.  I'm not sure if

16   DHS defendants have a different term for it.  It's sort of what

17   we pulled out from public documents that were news articles

18   that were written during the September 2021 time period.

19           THE COURT:  Ms. Onozawa, what is a colored paper

20   ticket?

21           MS. ONOZAWA:  I actually don't know other than what

22   Ms. Dhanji reported and what I have read in the paper.  I would

23   be uncomfortable trying to describe what it was without getting

24   the agency's view on what it should be.  I apologize --

25           MS. DHANJI:  Your Honor --

N5p2HaiC

1          MS. ONOZAWA:  -- your Honor.

2          MS. DHANJI:  Apologies.

3          Your Honor, my co-counsel just informed me that it was

4     actually something that was unique to Del Rio.  It was a paper

5     ticket that was handed out, but only at Del Rio.  It wasn't

6     part of the normal processing.

7          THE COURT:  Okay.  So, look, I will set a schedule for

8     motion practice and it is my preference that it be on one

9     track, as Ms. Onozawa suggested, rather than two tracks.  I do

10    want to allow the parties the opportunity to continue to

11    negotiate with respect to the second of these three items.  I

12    take it that the parties have staked out their positions with

13    respect to items one and three.  Correct, Ms. Onozawa?

14         MS. ONOZAWA:  Items one and three?  Sorry.  Can --

15    just to make sure I am responding yes to the right issues.

16         THE COURT:  One is the documents from DHS, two was the

17    documents that you were willing to continue to negotiate about,

18    and three is the documents that we are discussing now, the

19    specific items concerning what was distributed to the migrants

20    at Del Rio.

21         MS. ONOZAWA:  I see, yes.  One and three I think we

22    have -- we just don't think we might be able to bridge right

23    now.  We are willing to engage on search terms.  That's number

24    two.

25         THE COURT:  So with respect to that, I'm happy to give

N5p2HaiC

1  you more time and then push the date out for briefing a little

2  bit longer, but I don't know why we shouldn't otherwise

3  establish a briefing schedule now.  And I appreciate,

4  Ms. Onozawa, that if you are going to brief something or make a

5  motion, that it's going to require a lot of moving parts on

6  your part, but we have to move forward.  And maybe we can do it

7  in two different motions.  So we can set -- set a briefing

8  schedule now for items one and three, and if you are not able

9  to come to a settlement with respect to item two, then we can

10  schedule a briefing for that later.

11            MS. ONOZAWA:  That sounds reasonable to the

12  government, your Honor.

13            THE COURT:  Ms. Dhanji?

14            MS. DHANJI:  Your Honor, I think we would prefer one

15  date that includes the second part or the second item, rather.

16  So we are happy to have a couple of extra weeks to discuss the

17  search terms, but then I do think we would like one deadline,

18  if possible, one deadline for the parties to brief all three

19  issues.  Hopefully the second issue will disappear in that

20  time; but, if not, we would like one deadline.

21            THE COURT:  Why don't I push it back two weeks.

22            So the briefing schedule will be as follows:

23            The government's opening brief will be due on July 14.

24            The response and cross motion will be due four weeks

25  thereafter, which is August 11.

N5p2HaiC

1          The response by the government to the cross motion and

2     its reply will be due four weeks after that, which is September

3     8.

4          And plaintiffs' reply will be two weeks after that,

5     which is September 22.

6          MS. DHANJI:  Thank you, your Honor.

7          MS. ONOZAWA:  Sorry.  This is Tomoko Onozawa, your

8     Honor.

9          I was going to ask if we could push back the July 14

10    date by two weeks.  Ms. Kumar and I are going to be out at

11    varying periods from the end of June through the first week or

12    two of July.  So to build in that time, if we could make it at

13    the end of July or early August, that would be tremendously

14    helpful for us, and I think it will ensure that we have enough

15    time to gather the information and conduct the negotiations

16    that we need to do.

17         THE COURT:  Okay.  So July 28, and then four weeks

18    after that is August 25, four weeks after that is September 22,

19    and two weeks after that is October 6.

20         MS. DHANJI:  Thank you, your Honor.

21         Actually, if we could just come back to one item that

22    we discussed earlier, we have actually asked the government for

23    search term hit reports --

24         (AT&T conference tone)

25         THE DEPUTY CLERK:  I'm sorry.  I would just like to

N5p2HaiC

1    confirm that the court reporter is still on the line.

2                THE COURT REPORTER:  Yes.

3                (Pause)

4                MS. DHANJI:  If we could return to one item that's

5    very important to us, your Honor, we have actually asked the

6    government for a search term hit report, like, to run our

7    terms, basically, and give us the unique hit counts, the

8    document hit counts, and also to provide information about the

9    document review platform that the agencies are using, as well

10   as whether they are deduplicating the documents and whether

11   they are threading the documents appropriately.

12               That information is very important for us to proceed

13   with these negotiations.  If we don't get that information, I

14   think we will basically be in the same spot that we are right

15   now, where we don't have enough information to proceed.

16               And the same thing for having agency counsel on our

17   calls to negotiate these search terms.  You know, if the

18   government -- if the government is not committing to provide

19   all this information to us, then we are going to be in exactly

20   the same spot.  And I understand that our briefing schedule has

21   been moved out a little bit and I know Ms. Onozawa said that it

22   does take a little bit of time to run these search term hit

23   reports, but given that the briefing schedule is moved back, I

24   do think that there is sufficient time for us to get those

25   search term hit reports to us, as well as all of the rest of

N5p2HaiC

1    the information, so that we can actually proceed effectively.

2    Otherwise I am actually concerned that we will make no

3    progress, and then we will be in the same spot in a few weeks.

4    　　　　MS. ONOZAWA:  Your Honor, this is Tomoko Onozawa.

5    　　　　Look, we have an interest and we are motivated to

6    resolve this.  We are not trying to hide the ball here.  What I

7    want to avoid is being compelled to provide information in

8    furtherance of negotiations when we are still trying to

9    ascertain the agency's technical capabilities and timing on

10   providing them to plaintiffs.

11   　　　　We understand plaintiffs want them.  We understand why

12   they would be useful.  We just can't say right now if the

13   agencies can do that.  And if the agencies can't provide that

14   information, we want the discretion to figure out what we can

15   do to further these negotiations along.

16   　　　　As well, it would be best if you could just trust us,

17   trust the process, and make sure that we——Ms. Kumar and I——are

18   committed to moving these discussions along, but we just can't

19   bind the agencies to something that we don't know they can do.

20   　　　　MS. DHANJI:  Your Honor, may I briefly respond?

21   　　　　THE COURT:  Sure.

22   　　　　MS. DHANJI:  We have had this proposal for custodians

23   and search terms outstanding since February 10.  It's been

24   quite a while since we first proposed this.  I understand that

25   it's technically difficult, but we have actually asked for

N5p2HaiC

1    these search term hit reports and for information about the

2    search process several times, and it actually wasn't until we

3    had our conference scheduled that we actually got some

4    commitments from them about being able to provide this

5    information.

6           So I understand Ms. Onozawa to be saying that they

7    will provide that information, but it would be good to have a

8    deadline -- or, sorry, they will try to provide that

9    information but it would be good to have a deadline by which

10   they let us know whether or not they are going to be in a

11   position to provide it.  Because, like I said, I just -- this

12   has sort of been outstanding for a while, we have asked

13   multiple times for the information, and we really don't think

14   that we will be able to make any headway if we don't receive

15   any information about the search process.

16          MS. ONOZAWA:  This is Tomoko Onozawa.

17          We have provided proposed alternative search terms.

18   This was after a lot of agency diligence and effort which were

19   rejected.

20          Look, it's been a long and difficult process.  We are

21   committed to continue moving forward with it.  But it's not

22   fair to say that we haven't been, you know, doing what we can

23   on our end to get search terms and hit counts back to

24   plaintiffs.  What we have reported so far is very high.

25   Plaintiffs have expressed an interest in narrowing them and

N5p2HaiC

1    have asked for insight and information on what our original

2    search terms are.  We are trying to get that information to

3    them, and so I just don't think a deadline is appropriate,

4    particularly when negotiations can be so fluid.

5         THE COURT:  Well, look.  We have two months before the

6    briefs are due.  Let me ask you this, Ms. Onozawa.  I take it

7    you have provided some hit reports to plaintiffs already.

8         MS. ONOZAWA:  Yes.  This is actually in a footnote in

9    our May 19 letter.

10         THE COURT:  Okay.

11         MS. DHANJI:  Your Honor -- I apologize.

12         THE COURT:  Ms. Dhanji?

13         MS. DHANJI:  Yeah, your Honor, that actually is --

14    it's just a count.  It's not a hit report.  It just says that

15    they ran our terms and it hit 23,000 pages.  That is not a hit

16    report.  They have also only run it across one custodian.  They

17    have provided us no information that we would receive in a

18    search term hit report for what the document count was, what

19    the unique document count was, whether the documents were

20    deduplicated.  It just is a page count.  It is not enough

21    information for us to evaluate anything about whether the terms

22    need to be refined, whether there are terms that we can cut

23    down.  It just isn't helpful to move the process forward.

24         THE COURT:  Aren't these reports something that are

25    exchanged in the ordinary course of these cases?  Doesn't this

N5p2HaiC

1    happen --_

2              MS. DHANJI:  They --

3              THE COURT:  -- all the time?

4              MS. ONOZAWA:  So they can be when parties are

5    negotiating search terms.  But, look, I can't speak on behalf

6    of CBP, ICE, and DHS Headquarters in terms of whether they can

7    generate the precise kinds of hit reports that plaintiffs are

8    saying they need.  We are willing to take that back.  We are

9    willing to ask the questions that they want us to ask.  I just

10   can't say at this point that we should be ordered to do it

11   because I don't know if we can in the exact format that

12   Ms. Dhanji is describing.

13             THE COURT:  Okay.  Well, then, I will direct the

14   government to figure out whether or not they can and report

15   back to plaintiffs.  And again, if this needs to be litigated,

16   it will be litigated.  I'm not going to direct that you settle

17   this issue between now and July 28.  I take Ms. Onozawa at her

18   word that the government is incentivized to provide this

19   information, to have this information, so that the parties can

20   sit down and have an intelligent discussion about what the

21   universe of these documents is.  The government, I don't

22   believe, is interested in providing more information than they

23   need to or dumping a ton of documents on plaintiffs.

24             So, Ms. Onozawa, try to figure out as soon as you can

25   what the agencies are going to be able to do and get back to

N5p2HaiC

1    Ms. Dhanji.

2           MS. ONOZAWA:  We will, your Honor.

3           THE COURT:  Okay.

4           So hopefully there will be some agreement with respect

5    to that category two.  Otherwise, I look forward to receiving

6    your papers.  And if there is anything I can do between now and

7    then in terms of helping matters along, feel free to contact

8    chambers, and I will be happy to speak with you again.  Okay?

9           MS. DHANJI:  Thank you, your Honor.

10          MS. ONOZAWA:  Thank you.

11          THE COURT:  Okay.  With that, we are adjourned.  Stay

12   well, everyone.

13                              oOo

14

15

16

17

18

19

20

21

22

23

24

25