### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAITIAN BRIDGE ALLIANCE, AFRICAN COMMUNITIES TOGETHER, and UNDOCUBLACK NETWORK, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, and FEDERAL BUREAU OF PRISONS, <br><br> Defendants. | No. 22 Civ. 8344 (ER) |

### PLAINTIFFS' MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANTS' MOTION AND
### IN SUPPORT OF PLAINTIFFS' CROSS-MOTION
### FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................1

BACKGROUND ..........................................................................................................2

    A.    Events in Del Rio ............................................................................2

    B.    FOIA Requests and This Litigation .................................................6

    C.    Continued Negotiation and Impasse ................................................8

    D.    Cross-Motions for Summary Judgment ...........................................9

LEGAL STANDARD ...................................................................................................9

ARGUMENT ...........................................................................................................11

I.    THE AGENCIES MUST SEARCH FOR THE DOCUMENTS SOUGHT IN REQUESTS 6 AND 7...........................................................................................11

    A.    Request 6 Records.........................................................................11

    B.    Request 7 Records.........................................................................16

II.    THE AGENCIES SHOULD BE ORDERED TO UTILIZE PLAINTIFFS' PROPOSED TERMS TO SEARCH FOR KEY COMMUNICATIONS. ........................19

III.    THE COURT SHOULD IMPOSE A PRODUCTION SCHEDULE TO PREVENT FURTHER UNREASONABLE DELAY.......................................................22

CONCLUSION.........................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Am. Ctr. for L. & Just. v. U.S. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78
(D.D.C. 2021) ....................................................................................................14, 15

*Am. Oversight v. U.S. Gen. Servs. Admin.*, 486 F. Supp. 3d 306 (D.D.C.
2020) ...............................................................................................................................20

*Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just.*, 377
F. Supp. 3d 428 (S.D.N.Y. 2019)...........................................................10, 21, 22

*Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 711
F.3d 180 (D.C. Cir. 2013)............................................................................................22

*Clevenger v. U.S. Dep't of Just.*, 2020 WL 1846565 (E.D.N.Y. Apr. 3, 2020)...........................18

*Dep't of Just. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749
(1989) ...............................................................................................................................10

*Fox News Network, LLC v. U.S. Dep't of the Treasury*, 678 F. Supp. 2d 162
(S.D.N.Y. 2009).............................................................................................................21

*Immigrant Def. Project v. U.S. Dep't of Homeland Security*, 2023 WL
1966178 (S.D.N.Y. Feb. 13, 2023)....................................................................10, 21

*Informed Consent Action Network v. U.S. Food & Drug Admin.*, 2022 WL
902083 (S.D.N.Y. Mar. 28, 2022) ...........................................................................12

*Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control &
Prevention*, 560 F. Supp. 3d 810 (S.D.N.Y. 2021) ..............................................15

*LaCedra v. Exec. Off. for U.S. Att'ys*, 317 F.3d 345 (D.C. Cir. 2003) ....................................15, 18

*Long v. Off. of Pers. Mgmt.*, 692 F.3d 185 (2d Cir. 2012)......................................................10

*NAACP Legal Def. & Educ. Fund, Inc. v. Dep't of Just.*, 463 F. Supp. 3d 474
(S.D.N.Y. 2020)............................................................................................................21

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*,
877 F. Supp. 2d 87 (S.D.N.Y. 2012).................................................................21, 23

*New York Times Co. v. U.S. Dep't of Justice*, 872 F. Supp. 2d 309 (S.D.N.Y.
2012) ...............................................................................................................................10

*Open Soc'y Just. Initiative v. Cent. Intel. Agency*, 399 F. Supp. 3d 161
(S.D.N.Y. 2019)............................................................................................................23

*Phillips v. Immigr. & Customs Enf't*, 385 F. Supp. 2d 296 (S.D.N.Y. 2005) ................................22

*Pub. Emps. for Env't Resp. v. U.S. Env't Prot. Agency*, 314 F. Supp. 3d 68
(D.D.C. 2018) .......................................................................................................13, 15, 17

*Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 2016 WL 362459 (D. Colo.
Jan. 29, 2016) ......................................................................................................................15

*Seife v. United States Dep't of State*, 298 F. Supp. 3d 592 (S.D.N.Y. 2018)
........................................................................................................................10, 12, 13, 17

*Tarzia v. Clinton*, 2012 WL 335668 (S.D.N.Y. Jan. 30, 2012) ......................................11

*Truitt v. Dep't of State*, 897 F.2d 540 (D.C. Cir. 1990) ................................................16

## OTHER AUTHORITIES

6 C.F.R. § 5.3 ....................................................................................................................12

5 U.S.C. § 552 ............................................................................................................ *passim*

Fed. R. Civ. P. 56 ................................................................................................................1

Local Civil Rule 56.1 ........................................................................................................10

Plaintiffs, Haitian Bridge Alliance, African Communities Together, and UndocuBlack Network, respectfully submit this Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment, ECF No. 59, and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.

## INTRODUCTION

In September 2021, thousands of predominantly Haitian migrants arrived at the U.S. border in Del Rio, Texas, seeking asylum.  The plight of these migrants and the mistreatment they suffered at the hands of the U.S. government quickly became front-page news.  Deeply concerned by what transpired, Plaintiffs promptly exercised their statutory rights under the Freedom of Information Act ("FOIA") to seek agency records surrounding those events in and around Del Rio.  Yet, after waiting nearly a year, Plaintiffs had received just a single document from one agency and no documents from three others.  Plaintiffs were forced to file this lawsuit.

Plaintiffs have now suffered almost a year of additional delay as they continue to wait for final responses to their FOIA requests, which seek records needed to support their efforts to protect and advocate for migrants.  Months of negotiations between Plaintiffs and the Government that followed the initiation of this litigation finally resolved most issues concerning the searches that the agencies would conduct.  But still the Government refuses to search for certain key records and to utilize clearly relevant search terms and time periods.  In particular, two items remain unresolved that are now the subject of the parties' cross motions for partial summary judgment: (1) whether the Government will search for certain categories of records Plaintiffs seek (identified below as Requests 6 and 7), and (2) whether the Government will use the search terms that Plaintiffs proposed when it searches for responsive communications from certain agreed-upon custodians.

1

Requests 6 and 7 are detailed and well described; they easily pass FOIA's requirement that requesters "reasonably describe[ ]" the records they seek.  5 U.S.C. § 552(a)(3)(A).  The Government should be ordered to conduct searches for those records.  Plaintiffs' proposed search terms likewise are reasonable, clearly relevant, and are the result of months of negotiations between the parties.  The Government should be ordered to use those search terms now—rather than, as the Government insists, waiting to adjudicate this important issue until *after* the agencies have used other terms, which they refuse to even reveal to Plaintiffs, and which are likely to prove inadequate and will only further prolong this matter.  Additionally, the Court should impose a production schedule to ensure the Government processes the records within a reasonable time.  After all the delay Plaintiffs have faced to date, they are at least entitled to expedient processing going forward.

For these and the other reasons explained below, Plaintiffs respectfully request that the Court deny the Government's motion for partial summary judgment and grant Plaintiffs' cross-motion for partial summary judgment.

## BACKGROUND

### A.    Events in Del Rio

In September 2021, approximately 15,000 Haitian migrants fleeing danger and instability crossed the Rio Grande River and were sequestered by the U.S. government in an encampment near Del Rio, Texas.[1]  The migrants, seeking asylum, were instead surrounded by armed agents

---

[1] *See, e.g.*, James Dobbins, Eileen Sullivan and Edgar Sandoval, *Thousands of Migrants Huddle in Squalid Conditions Under Texas Bridge*, N.Y. Times (Sept. 16, 2021), https://www.nytimes.com/2021/09/16/us/texas-migrants-del-rio.html; *see also* Pineiro Decl., ECF No. 61, ¶ 7; Howard Decl., ECF No. 62, ¶ 7.

and given little or no access to basic necessities like food, water, shelter, and medical attention.[2] Crowds of people slept on the dirt and were forced to wait in triple-digit heat amid conditions of deteriorating sanitation.[3]  Starved and dehydrated migrants were forced to attempt crossing the Rio Grande back to the Mexican town of Ciudad Acuña to obtain food, baby formula, water, and hygiene supplies.[4]  Individuals who attempted the re-crossing faced many risks, including drowning and being barred from reentering the encampment where their loved ones waited for them to return with the critical supplies.[5]

To make matters worse, Government agents harassed and intimidated migrants, including through physical force.[6]  The mistreatment was encapsulated in widely circulated images of an encounter between Haitian migrants, who were bringing food and water to their families, and mounted U.S. Customs and Border Protection ("CBP") agents.  As the migrants attempted to climb onto the U.S. bank of the Rio Grande, an agent charged his horse toward them, swinging his reins like a whip:

---

[2] *Beyond the Bridge: Documented Human Rights Abuses and Civil Rights Violations Against Haitian Migrants in the Del Rio, Texas Encampment*, Robert F. Kennedy Human Rights & Haitian Bridge Alliance 29 (March 29, 2022), https://rfkhr.imgix.net/asset/Del-Rio-Report.pdf [hereinafter *Beyond the Bridge*].

[3] Dobbins, *et al.*, *supra* note 1.

[4] *Beyond the Bridge*, *supra* note 2, at 29.

[5] Molly Hennessy-Fiske, *Confined to U.S. border camp, Haitian migrants wade to Mexico for supplies*, L.A. Times (Sept. 20 2021), https://www.latimes.com/world-nation/story/2021-09-20/confined-to-u-s-border-camp-haitian-migrants-wade-to-mexico-for-supplies-their-moneys-running-out.

[6] *Beyond the Bridge*, *supra* note 2, at 29.



Bill Chappell, *U.S. Border Agents Chased Migrants On Horseback. A Photographer Explains What He Saw*, NPR (Sept. 21, 2021), https://www.npr.org/2021/09/21/1039230310/u-s-border-agents-haiti-migrants-horses-photographer-del-rio (containing image taken by Paul Ratje).

Secretary of Homeland Security Alejandro Mayorkas acknowledged that the images were "horrifying" and that they "painfully conjured up the worst elements of our nation's ongoing battle against systemic racism."[7]

Ultimately, the government engaged in a mass expulsion of the migrants, forcing many to return to Haiti without any opportunity to access the asylum system.[8]  The government's efforts

---

[7] *Press Briefing by Press Secretary Jen Psaki and Secretary of Homeland Security Alejandro Mayorkas, September 24, 2021*, The White House, https://www.whitehouse.gov/briefing-room/press-briefings/2021/09/24/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-homeland-security-alejandro-mayorkas-september-24-2021/ [hereinafter White House Press Briefing].

[8] Nick Miroff, *Most of the migrants in Del Rio, Tex., camp have been sent to Haiti or turned back to Mexico, DHS figures show*, Wash. Post (Oct. 1, 2021), https://www.washingtonpost.com/national/haitians-border-deportations/2021/10/01/bfa38852-222a-11ec-8fd4-57a5d9bf4b47_story.html; *see also* Pineiro Decl., ECF No. 61, ¶ 7.

included the announcement and implementation of a "comprehensive strategy" by the Department of Homeland Security ("DHS") to swiftly expel the migrants.[9]  On September 20, 2021, Secretary Mayorkas traveled to Del Rio to emphasize the "all-of-government" effort underway.[10]  By September 24, 2021, he announced that the migrants had been cleared from the encampment: "[L]ast weekend, we had approximately 15,000 individuals in the Del Rio section," he said during a White House briefing.  "I committed to addressing that within 10 days, and today we have none."[11]

The events in Del Rio were front-page news.  According to CBP, the arrival of the thousands of migrants constituted the "largest mass migration event in [the] recorded history" of the U.S. Border Patrol, triggering a "humanitarian crisis" at the border.  Ex. C at 2 (CBP after-action report, dated Oct. 7, 2021, produced to Plaintiffs).[12]  The events led to investigations, including the release of a report by CBP's Office of Professional Responsibility in July 2022.[13]

---

[9] *DHS Outlines Strategy to Address Increase in Migrants in Del Rio*, Dep't of Homeland Sec., (Sept. 18, 2021), https://www.dhs.gov/news/2021/09/18/dhs-outlines-strategy-address-increase-migrants-del-rio.

[10] *Secretary Mayorkas Delivers Remarks in Del Rio, TX*, Dep't of Homeland Sec., (Sept. 20, 2021), https://www.dhs.gov/news/2021/09/20/secretary-mayorkas-delivers-remarks-del-rio-tx.

[11] White House Press Briefing, *supra* note 7.

[12] All "Ex." citations are to the exhibits attached to the accompanying Declaration of Michael Linhorst.

[13] *Report of Investigation*, Dep't of Homeland Sec., U.S. Customs & Border Protection, Office of Prof'l Responsibility (July 8, 2022), https://www.cbp.gov/sites/default/files/assets/documents/2023-May/202112280-cbp-closing-report-redacted-usbp-opr-min.pdf; *see also Del Rio Area Struggled with Prolonged Detention, Consistent Compliance with CBP's TEDS Standards, and Data Integrity*, Dep't of Homeland Sec., Office of Inspector General (Sept. 29, 2022), https://www.oig.dhs.gov/sites/default/files/assets/2022-10/OIG-22-80-Oct22.pdf.

B.      **FOIA Requests and This Litigation**

Plaintiffs are non-profit organizations that advocate for the rights of Black migrants and other immigrants.  Alarmed by the events in Del Rio, they promptly filed a FOIA request with DHS, the Bureau of Prisons ("BOP"), CBP, and U.S. Immigration and Customs Enforcement ("ICE"), and other agencies on October 1, 2021 ("2021 FOIA Request").  *See* Ex. A.  Plaintiffs additionally filed a FOIA request on February 25, 2022 ("2022 FOIA Request").  *See* Ex. B. Plaintiffs requested that the Government produce various records relating to Del Rio, as well as related policies, directives, and investigations.

Plaintiffs' need for the records they requested was—and remains—pressing.  More Haitian migrants continue to seek safety in the United States, and Plaintiffs are advocating for their rights, even as reports of mistreatment of Haitian migrants persist.[14]  Yet by September 2022—nearly a year after Plaintiffs submitted their first FOIA request—Defendants CBP, DHS, and ICE (collectively, the "Government" or the "Agencies") had produced nothing.  Linhorst Decl. ¶ 4. BOP had produced only a single, 32-page document.[15]  Linhorst Decl. ¶ 5.  As a result, Plaintiffs were forced to file this suit.[16]  As Plaintiffs explained in their Complaint, "There is an urgent need for transparency about the manner in which the U.S. government responded to the thousands of Haitian migrants who attempted to seek asylum at the border in September 2021, and regarding

---

[14] *See "They do not treat us like people": Race and migration-related torture and other ill-treatment of Haitians seeking safety in the USA*, Amnesty International 47 (Sept. 22, 2022), https://www.amnesty.org/en/documents/amr36/5973/2022/en/.

[15] BOP is not relevant to the issues raised by the parties' motions for partial summary judgment.

[16] The agencies' failure to respond within FOIA's time limits constituted a "constructive" denial of Plaintiffs' requests, allowing Plaintiffs to bring this suit directly rather than first pursuing administrative remedies.  *See* 5 U.S.C. § 552(a)(6)(C).  Defendants do not dispute Plaintiffs' standing.

the government's ongoing response to the migrants who continue to attempt to seek asylum at the southwest border every day."  ECF No. 1 at ¶ 19.

Even after initiating litigation, Plaintiffs attempted to resolve the disputes without the need for the Court's intervention.  These painstaking efforts by Plaintiffs included, on February 10, 2023, proposing a detailed search plan for the October 2021 FOIA request, in response to the Government's position that the request needed clarification.  *See* Ex. D (S. Dhanji letter of Feb. 10, 2023).  The Government did not respond until seven weeks later.  *See* Ex. E (T. Onozawa letter of March 30, 2023).

Despite the significant delay, based on Plaintiffs' plan and subsequent correspondence, *see* Ex. F, the parties reached agreement on April 19, 2023, concerning many aspects of the search for responsive records, and continued to work to narrow their areas of dispute.  *See* Ex. G at 6 (attachment to Plaintiffs' letter of April 19, 2023, showing Plaintiffs' proposals in redline).  The Government responded on May 2, accepting some of Plaintiffs' proposed modifications, but continuing to refuse to search for other records altogether or otherwise imposing unjustified limitations.  *See* Ex. H (Defendants' May 2, 2023, Redline of Plaintiffs' April 19, 2023, Redline, showing Government's refusal to adopt certain proposals).

By the time of the pre-motion conference before this Court on May 25, 2023, the dispute between the parties as to the scope of the search the agencies would conduct had narrowed to three principal issues related to the October 2021 Request.  *See* Pls.' Letter re: Pre-Motion Conference, ECF No. 46, at 2–3.

Subsequently, after the conference, the Government agreed to conduct searches to resolve one of the issues.  *See, e.g.*, Gov't Letter of July 28, 2023, ECF No. 57, at 2; Gov't Br. in Support

of Mot. for Partial Summ. J., ECF No. 60 ("Gov't Br."), at 10, 14 n.4.[17]   It also committed to

processing the remainder of the searches that were agreed upon by the parties—*i.e.*, what the

Government set forth in its May 2 proposal.  *See* Pls.' Letter, ECF No. 46 at 3; *see also* Gov't

Br. at 2.

Two disputes were thus left unresolved:

(1)     the Government's refusal to search for certain categories of records related to Del

Rio, identified as "Request 6" and "Request 7" in the Government's May 2

proposal, *see* Ex. H (Defendants' May 2, 2023 Redline) at 4–6, including statistics,

documents relating to use of force incidents, threats, and harassment, and other key

records;[18] and

(2)     the Government's refusal to use a set of search terms, which were the subject of

multiple rounds of negotiations, when the Agencies conduct certain targeted

searches for communications, insisting instead that they be provided unilateral

discretion to conduct searches using undisclosed terms and undisclosed time

periods, *see id*. at 9.

**C.     Continued Negotiation and Impasse**

Following the May 25 pre-motion conference, Plaintiffs repeatedly followed up with the

Government for information on hit counts and the Agencies' technical capacities in an attempt to

---

[17] Namely, the Government agreed to conduct certain searches of the DHS Headquarters that the agency previously insisted were futile.  CBP also added a custodian, Chris Magnus, whose exclusion had previously been in dispute.  *See* Gov't Br. at 18 n.6.

[18] Indeed, while the Government devotes attention in its brief to analyzing Plaintiffs' *original* Requests 1 and 2 from their October 2022 Request, those are not actually at issue in the parties' respective motions.  The original requests were proper under FOIA, but they will not be addressed further here because, as discussed, the parties subsequently narrowed their disputes through extensive negotiations.

resolve their dispute over search terms.  *See* Ex. I at 10–15.  Not until July 17 did the Government

provide any information—albeit without any of the specificity requested by Plaintiffs.  *See id*.

at 8–10.  Nevertheless, in an attempt to resolve, or at least narrow, the dispute, Plaintiffs proposed

a compromise in which the Agencies would prioritize running a narrower set of search terms.  *Id*.

at 6–7.  Despite repeated requests by Plaintiffs, the Government refused to address Plaintiffs'

proposal, or to disclose what search terms the Agencies proposed in lieu of those requested by

Plaintiffs.  *See id*. at 1–2, 4–6.[19]

Moreover, the Government made clear in these communications following the pre-motion

conference that the Agencies were planning to take a substantial amount of time to produce the

records requested by Plaintiffs.  In fact, the Government even asserted in one communication that

it would take "decades" to comply.  *Id.* at 9.

## D.    Cross-Motions for Summary Judgment

On August 11, 2023, the Government moved for partial summary judgment on the two

issues remaining in dispute.  The Government argues that Requests 6 and 7 are improper and that

it should have full discretion to run search terms of its own choosing.  Plaintiffs now oppose the

Government's motion and cross-move for summary judgment on the same questions.  Plaintiffs

further request that the Court impose a schedule for the timely completion of the Agencies' search

for, and production of, documents.

## LEGAL STANDARD

"FOIA was enacted to promote honest and open government, and to ensure public access

to information created by the government in order to hold the governors accountable to the

---

[19] The parties did appear to be reaching agreement as to one agency, ICE, but Plaintiffs never
received confirmation from the Government.  *See* Ex. I at 1.  The Government's brief makes no
mention of it and appears to revert to its original position.

governed." *Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012) (citations and quotation marks omitted).  FOIA thus "strongly favors a policy of disclosure."  *Immigrant Def. Project v. U.S. Dep't of Homeland Security*, 2023 WL 1966178, at *2 (S.D.N.Y. Feb. 13, 2023) (quoting *Nat'l Council of La Raza v. U.S. Dep't of Just.*, 411 F.3d 350, 355 (2d Cir. 2005)).  For that reason, a "court is to resolve all doubts in favor of disclosure."  *Long*, 692 F.3d at 190.

In FOIA litigation, the statute directs the district courts to "determine the matter *de novo*," with no deference to the agency's determinations.  5 U.S.C. § 552(a)(4)(B).  Therefore, even as the moving party must show that it is entitled to summary judgment, the agency faces a high hurdle. If, as here, the agency "claims that responding to a request is unreasonable, 'it bears the burden to provide [a] sufficient explanation as to why such a search would be unreasonably burdensome.'" *Seife v. United States Dep't of State*, 298 F. Supp. 3d 592, 612 (S.D.N.Y. 2018) (quoting *Ayuda, Inc. v. Fed. Trade Comm.*, 70 F. Supp. 3d 247, 275 (D.D.C. 2014)).  That is, "FOIA expressly places the burden 'on the agency to sustain its action.'"  *Dep't of Just. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B))).

Moreover, a court may "supervise the agency's ongoing progress, ensuring that the agency continues to exercise due diligence in processing the request."  *Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just.*, 377 F. Supp. 3d 428, 433 (S.D.N.Y. 2019) (citation omitted). And "FOIA imposes no limit on courts' equitable powers in enforcing its terms."  *Id.*[20]

---

[20] Plaintiffs, like Defendants, have not submitted a Local Rule 56.1 statement because "[t]he general rule in this Circuit is that in FOIA actions . . . Local Civil Rule 56.1 statements are not required."  *New York Times Co. v. U.S. Dep't of Justice*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) (internal quotations marks and alterations omitted); *see also* Gov't Br. 11 n.3.

## ARGUMENT

The Court should enforce the Government's obligations under FOIA by: (1) ordering the Agencies to search for the documents sought in Requests 6 and 7; (2) ordering the Agencies to adopt Plaintiffs' proposed search terms; and (3) imposing a production schedule that calls for no less than 1,500 pages to be processed per month per agency.

## I.     THE AGENCIES MUST SEARCH FOR THE DOCUMENTS SOUGHT IN REQUESTS 6 AND 7.

Requests 6 and 7 reasonably describe records that Defendants do not dispute that they possess.  Under FOIA, "federal agencies should go as far as they reasonably can to ensure that they include what requesters want to have included within the scopes of their FOIA requests." *Tarzia v. Clinton*, 2012 WL 335668, at *9 (S.D.N.Y. Jan. 30, 2012) (quoting *Amnesty Int'l U.S.A. v. CIA*, 2008 WL 2519908, at *12 (S.D.N.Y. June 19, 2008)).  Yet here, the Agencies refuse to search at all for key groups of records sought by Plaintiffs—and the Agencies base their refusal on a wholly unreasonable interpretation of the requests.  The Agencies should be ordered to search for the records that Plaintiffs sought in Request 6 and Request 7.  *See* Ex. G (Plaintiffs' April 19, 2023 Proposal) at 9–10.

### A.     Request 6 Records

Request 6 seeks seven categories of documents describing the overall conditions, harms to migrants, and government responses to the Del Rio crisis.  *See id*.  The categories are detailed and clear.  They easily meet FOIA's requirement that the request "reasonably describe[ ]" the records it seeks, and the statute therefore requires the Agencies to search for the records.  5 U.S.C. § 552(a)(3)(A).

FOIA's "reasonably describes" requirement "is satisfied 'if a professional employee of the agency familiar with the subject matter can locate the records with a reasonable amount of effort.'"

*Seife v. U.S. Dep't of State*, 298 F. Supp. 3d 592, 611 (S.D.N.Y. 2018) (quoting *Freedom Watch,*

*Inc. v. Cent. Intelligence Agency*, 895 F.Supp.2d 221, 228 (D.D.C. 2012)); *see also* 6 C.F.R.

§ 5.3(b) (DHS regulation stating request description must allow personnel to locate records "with

a reasonable amount of effort" through an "organized, non-random search").   Consistent with

FOIA's overarching goal of disclosure, this requirement "is 'not to be used as a method of

withholding records.'"   *Informed Consent Action Network v. U.S. Food & Drug Admin.*, 2022 WL

902083, at *2 (S.D.N.Y. Mar. 28, 2022) (quoting *Pub. Emps. for Env't Resp. v. U.S. Env't Prot.*

*Agency*, 314 F. Supp. 3d 68, 74 (D.D.C. 2018)); *see also id.* ("The purpose of the requirement is

to enable the agency to locate the records in question," not to withhold records.).

Well in line with the statutory requirement, Request 6 reasonably describes the records it

is seeking.   It provides detailed descriptions, along with narrow date parameters of less than one

month, for each category of record.   Request 6 seeks "[r]ecords reflecting" specified data,

including:

- the "total number of requests made by Migrants in Del Rio between September 1,

  2021, and September 25, 2021," for food, water, medical treatment, and other

  essential needs, Request 6(a);

- the quantity of those items the agency actually provided to the migrants, and how

  many times the agency did so, Request 6(b);

- the total number of migrants "in Del Rio between September 1, 2021, and

  September 25, 2021, who died, drowned, were pregnant, went into labor, gave birth,

  or were hospitalized," Request 6(d), and the manner in which the agency tracked

  and addressed those events, Request 6(c);

12

- the types of documents collected from, created, or provided to migrants during processing, Request 6(e); and

- demographic data such as the "age, immigration history (if any) expressed fear of return (if applicable), medical condition, and familial relationships" of the migrants, Request 6(f).[21]

A "professional employee" familiar with this subject should be able to find these requested records "with a reasonable amount of effort.'" *See Seife*, 298 F. Supp. 3d at 611.  The request's categories are clearly defined and set out in such detail as to specify the nature of the events or items targeted in exact time periods.  The Agencies have no basis for alleging that Request 6 "fails to reasonably describe the records" it seeks.  Gov't Br. at 9, 14.

Instead, the Agencies premise their objection to this request on a red herring—that the request somehow would require the search for effectively "all" documents associated with Del Rio, such as "virtually *all* daily operational communications" and "virtually *all* migrant health records."  Gov't Br. at 15.  That is not a fair reading of the request—the agencies are "construing . . . the FOIA request far more broadly than the text supports" to make the request more demanding than it really is.  *Pub. Emps. for Env't Resp.*, 314 F. Supp. 3d at 79 (holding plaintiff reasonably described records sought and ordering agency to conduct search).  In fact, the request repeatedly uses language demonstrating that it does *not* require collection of all documents, but rather records "reflecting" or "sufficient to show" the identified categories of data.  These are targeted requests for records reflecting specific data and information—typically in the aggregate—and they are set out in detail.  And, in case there was any doubt, Plaintiffs have emphasized to the Government,

---

[21] The complete request is at Ex. G (Plaintiffs' April 19, 2023 Proposal) at 9–10.

including in the pre-motion process before this Court, these are *not* requests for "any and all documents." *See* Pls.' Response Letter re: Pre-Mot. Conference, ECF No. 49, at 3 ("There are no requests for 'any and all documents'; instead these are requests for records reflecting specific data and information . . . .").

Thus, Request 6(d), for example, seeks the *total* "numbers of Migrants in Del Rio between September 1, 2021, and September 25, 2021, who died, drowned, were pregnant, went into labor, gave birth, or were hospitalized"—it does not seek individual records about each death or pregnancy. Similarly, Request 6(f) asks for *aggregate* data showing the "age, immigration history (if any) expressed fear of return (if applicable), medical condition, and familial relationships of Migrants in Del Rio between September 1, 2021, and September 25, 2021." And Request 6(g) seeks aggregate data recording "the race, country of origin or domicile, age," and other key datapoints for members of families that had "a baby born in Del Rio between September 1, 2021 and September 25, [2021]" who were "expelled, removed, or deported." It does not seek individual records about each person. This aggregate data is important to Plaintiffs' understanding of the problems at Del Rio and the government's response, so that Plaintiffs may work to avoid such harm to migrants in the future.

These well-delineated categories are a far cry from the facts of the cases the Government cites, in which the requests at issue would have required the government to search "communications by 'any and all employees' . . . that might be 'remotely related'" to the categories in the requests. Gov't Br. at 16–17 (quoting *Am. Ctr. for L. & Just. v. U.S. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78, 87 (D.D.C. 2021) ("*ACLJ*")). In *ACLJ*, the requester sought documents "referencing or regarding in any way" certain topics. The court found the "regarding in any way" language to be overbroad. *ACLJ*, 573 F. Supp. 3d at 85. Indeed, the court in *ACLJ* noted that "[a]

request for documents that merely 'reference' certain topics might not be unreasonable." *Id.*[22]
Here, by contrast, Plaintiffs request only relevant records that reflect specific, well-defined
categories. For example, while the Government claims that Plaintiffs' request 6(c) "contains no
limiting language," Gov't Br. at 15, the specific categories requested by Plaintiffs—seeking only
records pertaining to migrants "who died, drowned, were pregnant, went into labor, gave birth, or
were hospitalized"—significantly limit the scope of relevant records.

Ultimately, as the Government acknowledges in its brief, Gov't Br. at 14, the Agencies are
"bound to read the request as drafted, not as agency officials might wish it was drafted." *Knight
First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*, 560 F. Supp. 3d
810, 821 (S.D.N.Y. 2021) (quoting *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984)) (cleaned
up). The Government is not entitled to construe the Request "far more broadly than the text
supports" such that, in the Government's view, it could be denied. *Pub. Emps. for Env't Resp.*,
314 F. Supp. 3d at 79. Rather, agencies are obligated to interpret a request "in favor of disclosure."
*LaCedra v. Exec. Off. for U.S. Att'ys*, 317 F.3d 345, 348 (D.C. Cir. 2003) (holding that, where
there were two plausible readings of FOIA request, agency must use the one that resulted in greater
disclosure).

And, further, "when an agency learns that it has misunderstood the scope of a request, it
has a duty to adjust its records search accordingly." *Rocky Mountain Wild, Inc. v. U.S. Forest
Serv.*, 2016 WL 362459, at *6 (D. Colo. Jan. 29, 2016). For example, after an agency incorrectly
interpreted a request to exclude a particular file that the requester was, in fact, seeking, the D.C.
Circuit held that the agency had a duty to conduct a reasonable search for the file once it learned

---

[22] Likewise, the Government's other citation on this point, *McKinley v. F.D.I.C.*, found that a
request for "any information available" was overbroad. 807 F. Supp. 2d 1, 6–7 (D.D.C. 2011).
Such language is not found in Plaintiffs' request.

of its error.  *Truitt v. Dep't of State*, 897 F.2d 540, 545–46 (D.C. Cir. 1990).  Here, Plaintiffs have made clear that they are not seeking "any and all" records, nor individual health records.  The Agencies are thus required to search for the requested records here.

### B.      Request 7 Records

Similarly, Request 7 seeks key records concerning such critically important issues as the use of force and threats of force against migrants.  *See* Ex. G (Plaintiffs' April 19, 2023 Proposal) at 10.  Once again, the Government does not dispute that it possesses responsive information.  The Government's objection to these requests is conclusory.  *See* Gov't Br. at 17–18.  And it again is based on a misguided reading of the request.

To begin, this request lists categories that are specific, properly described, and confined to events at a given location (Del Rio) during a limited time period (September 1–25, 2021), including:

- "if, when, and how the amount or speed of water flowing through the Rio Grande River within the Del Rio Sector changed" during the relevant time period, Request 7(a);

- "if, when, and how horse patrols, use of force techniques," and other specified tools or techniques were used in Del Rio, Request 7(b);

- how the government "determined whether and under what legal authority" migrants in Del Rio "should be arrested, removed, detained, deported, or expelled," Request 7(d); and

16

- how the government processed migrants in Del Rio, "including what documentation or other written records were created (or should have been created) during processing," Request 7(g).[23]

This is far from the "fishing expedition" that the Government claims. These are clearly defined requests—containing time limitations and relating to a specific location and incident—that would allow an agency employee familiar with the subject matter to locate the records with a reasonable effort. *Seife*, 298 F. Supp. 3d at 611; *Pub. Emps. for Env't Resp.*, 314 F. Supp. 3d at 74. Tellingly, the two cases the Government cited for its "fishing expedition" argument concern

---

[23] The complete request seeks ICE, CBP, and/or DHS Records reflecting the following information, to the extent not captured in the preceding requests:

    a.  if, when, and how the amount or speed of water flowing through the Rio Grande River within the Del Rio Sector changed between September 1, 2021 and September 25, 2021.

    b.  if, when, and how horse patrols, use of force techniques, crowd management techniques, crowd control techniques, restraints, motorcycles, whips, ropes, reins, aircraft, vehicles, and weapons were used in Del Rio between September 1, 2021 and September 25, 2021.

    c.  if, when, and how Migrants in Del Rio between September 1, 2021 and September 25, 2021 were threatened, had violence used against them, were intimidated, were harassed, were discriminated against, or were deterred from arriving in Del Rio.

    d.  how the Agency determined whether and under what legal authority (e.g., Title 8, Title 42 Order) Migrants in Del Rio between September 1, 2021 and September 25, 2021 should be arrested, removed, detained, deported, or expelled.

    e.  how the Agency determined to which country deported or expelled Migrants in Del Rio between September 1, 2021 and September 25, 2021 should be sent.

    f.  how the Agency determined whether Migrants in Del Rio between September 1, 2021 and September 25, 2021 who were placed in Title 8 removal processing should be detained, paroled, or released on their own recognizance pending removal.

    g.  how the Agency processed Migrants in Del Rio between September 1, 2021 and September 25, 2021, including what documentation or other written records were created (or should have been created) during processing.

Ex. G (Plaintiffs' April 19, 2023 Proposal) at 10.

requests that were plainly far broader and less defined than the requests at issue here.  *See* Gov't Br. at 18 (citing *Dale v. I.R.S.*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (requester sought "any and all documents" that "relate in any way" to the subject of the request, with no time or geographic limitation); *Clevenger v. U.S. Dep't of Just.*, 2020 WL 1846565, at *13 (E.D.N.Y. Apr. 3, 2020) (finding request overbroad where it sought "all NDAs between the FBI and any other government entity that prohibit the release of information," with no limitations regarding date or scope).  These cases only underscore that Plaintiffs' requests are permissible.

The Government's assertion that these are improper "catch-all" requests, Gov't Br. at 17–18, is also meritless.  Plaintiffs noted in the lead-in to Request 7 that they sought records "to the extent not captured in the preceding sections," *see* Ex. G at 10, to convey that they did not wish for the Agencies to incur the burden of conducting duplicative searches.  It is the height of irony for the Government to now contend that this attempt at reducing the Agencies' burden somehow renders the requests "impermissibl[e]."  Gov't Br. at 18.  If the Agencies would rather disregard Plaintiffs' attempt to reduce their burden, they may simply do so and produce documents twice.  But it is baseless for the Agencies to assert this as a basis for failing to conduct searches for the important records sought here by Plaintiffs.[24]  *See, e.g.*, *LaCedra v. Exec. Off. for U.S. Att'ys*, 317 F.3d 345, 348 (D.C. Cir. 2003) (holding, where requestor sought "all documents" pertaining to a topic and also narrower groups of documents within the broader topic, that the agency could not

---

[24] In fact, the Government complains that Request 7 requires "duplicative searches for records responsive to Request Nos. 1–5."  *See* Gov't Br. at 17.  To begin, for all the reasons discussed, Request 7 is not asking the Agencies to re-do searches they will conduct in response to other requests; it is expressly seeking records that fall outside the scope of the prior requests.  But further, the Government cannot have it both ways—complaining both that the request purportedly requires duplicative searches and complaining that expressly disclaiming duplicative searches somehow renders it impermissible.

stop at searching for the narrower groups, but was also required to search for relevant documents outside of those groups).

In short, there is no legitimate basis under FOIA to refuse to process these requests. The Agencies should be ordered to search for and produce records responsive to Request 7.

## II.  THE AGENCIES SHOULD BE ORDERED TO UTILIZE PLAINTIFFS' PROPOSED TERMS TO SEARCH FOR KEY COMMUNICATIONS.

The parties have agreed that the Government will search the communications of certain custodians for responsive records. But the Agencies persist in refusing to conduct this search utilizing clearly relevant search terms relating to the events of Del Rio over specific time periods proposed by Plaintiffs. *See* Ex. H (Defendants' May 2, 2023 Redline) at 9. Indeed, the Government has refused to even say what terms it would use instead. The Government should be ordered to employ the search terms Plaintiffs proposed over those time periods.

The proposed search terms were developed over the course of months. Plaintiffs first proposed using a set of terms to search custodians' communications in their February proposal. Ex. D (S. Dhanji letter of Feb. 10, 2023) at 6–7. The Government appeared receptive to the concept of using search terms, although it proposed a narrower set. Ex. F (D. Kumar letter of April 12, 2023) at 9. Since then, the parties have agreed to the general approach of running search terms over custodians' communications, and they have agreed to the list of custodians.

Plaintiffs' proposal is narrow and carefully calibrated to result in the records Plaintiffs seek. *See* Ex. G (Plaintiffs' April 19, 2023 Proposal) at 10–11. In particular, Plaintiffs have proposed these search terms and time periods:

- Time frame: 9/1/2021 to 10/31/2021

  - ("Del Rio" OR Acuna OR Acuña) AND (migrant! OR Haiti! OR immigra! OR alien! OR illegal! OR reentrant! OR famil!)

- Time frame: 9/1/2021 to 10/1/2021

  o (Haiti!) w/5 (migrant! OR immigra! OR alien! OR illegal!)

- Time frame: 10/31/2021 to Date of Commencement of Search

  o ("Del Rio" OR Acuna OR Acuña) AND (migrant! OR Haiti! OR immigra! OR alien! OR illegal! OR reentrant!) AND (investigat! OR audit! OR evaluat! OR inspect!)

*Id*.  Given the precision of the terms, Plaintiffs further have requested that the Government simply produce all documents that are identified after running the search terms over the communications of the parties' agreed-upon custodians—thus eliminating the need for the Government to conduct a responsiveness review and improving the efficiency and speed of the search.[25]

Despite the narrow and targeted nature of the existing terms, Plaintiffs recently offered a further compromise in an effort to hasten resolution of this issue: Plaintiffs suggested prioritizing the first set of search terms, putting aside the second set for now, and, to further narrow the third set, Plaintiffs would consider a proposal from the Government.  Ex. I (M. Linhorst email of July 20, 2023) at 6–7.  But the Government did not respond to that overture.  In contrast, the Government has refused to even say what search terms it would use instead—let alone explain why Plaintiffs' terms are irrelevant or improper.

---

[25] The Government has suggested that it will nonetheless conduct a responsiveness review before producing the documents.  Since this part of the request simply seeks communications from specified custodians that hit on specified search terms, it is unclear what the responsiveness review would accomplish.  Such a review would also be improper.  When a request seeks "all records of communications with a set of . . . officials containing specific key terms," even if another part of the request seeks documents pertaining to a particular topic, an agency cannot "infer[ ] a nonexistent subject matter limitation" on the documents it produces in response to the search term request.  *Am. Oversight v. U.S. Gen. Servs. Admin.*, 486 F. Supp. 3d 306, 312 (D.D.C. 2020).  Further, to the extent any responsiveness review is conducted, it would have to be broad enough to encompass nearly every document containing these search terms.

Strikingly, nowhere in the Government's brief does it claim that Plaintiffs' proposed terms are unreasonable or not targeted at identifying relevant records.  Instead, the Government devotes merely three paragraphs to this issue and insists that the search must be left entirely to the Agencies' "discretion," without so much as a suggestion as to what terms the Agencies will use until sometime later, "*after* the agencies have produced any responsive records."  Gov't Br. at 18– 19.  But the Government significantly overstates the extent to which agencies are allowed a free hand in designing search terms.   "[A]n agency's choice of search terms is not conclusive." *Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just.*, 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019).  Agencies may not simply jettison "clearly relevant" terms or utilize "overly narrow" ones.  *See id*. (ordering agencies to utilize terms); *see also Immigrant Def. Project v. U.S. Dep't of Homeland Sec.*, 2023 WL 1966178, at \*5 (S.D.N.Y. Feb. 13, 2023) (finding that ICE was "unreasonable" when it "failed to use clearly relevant search terms identified by Plaintiffs"); *NAACP Legal Def. & Educ. Fund, Inc. v. Dep't of Just.*, 463 F. Supp. 3d 474, 485 (S.D.N.Y. 2020) (holding that "the search terms used were too restrictive to be reasonably calculated to uncover all responsive records"); *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 877 F. Supp. 2d 87, 110–11 (S.D.N.Y. 2012) (after government "failed to establish the adequacy" of certain searches, court instructed parties "to work cooperatively to design and execute" searches); *Fox News Network, LLC v. U.S. Dep't of the Treasury*, 678 F. Supp. 2d 162, 166 (S.D.N.Y. 2009) (ordering agency to justify its failure to include relevant search term or to conduct a new search).

Far from showing why their terms will be reasonable, the Agencies here have refused to reveal their proposed search terms at all.  This unfounded insistence on secrecy—in a FOIA case, no less—only promises to prolong the parties' dispute.  If the Agencies run their undisclosed terms

and the terms prove to be inadequate, the parties will be back before the Court yet again, wasting time and resources.  The parties already have engaged in extended negotiations over the course of months.  Plaintiffs have crafted a narrow set of search terms that responded to the Government's stated concerns.  The issue is properly before the Court and should be resolved now.  Indeed, as noted above, "FOIA imposes no limits on courts' equitable powers in enforcing its terms," and courts "may supervise the agency's ongoing process, ensuring that the agency continues to exercise due diligence in processing the request."  *See Brennan Ctr. for Just. at New York Univ. Sch. of L.*, 377 F. Supp. 3d at 433; *see also, e.g.*, *Phillips v. Immigr. & Customs Enf't*, 385 F. Supp. 2d 296, 301 (S.D.N.Y. 2005) (exercising authority to order agency to submit documents for *in camera* review "[a]s a matter of judicial economy").  Exercising that authority, the Court should order the Agencies to utilize Plaintiffs' search terms over the prescribed time periods.

## III.   THE COURT SHOULD IMPOSE A PRODUCTION SCHEDULE TO PREVENT FURTHER UNREASONABLE DELAY.

Finally, the Government already has forced Plaintiffs to wait more than a year and a half for a final response to their requests, despite Plaintiffs' need for the documents and FOIA's explicit statutory requirement that records be provided "promptly."  5 U.S.C. § 552(a)(3)(A); *see also Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 711 F.3d 180, 188 (D.C. Cir. 2013) (Kavanaugh, J.) (FOIA's requirement that agencies make records "promptly available" "typically would mean within days or a few weeks" of the agency's decision to respond, "not months or years.").  Yet the Government recently suggested its response may not be complete for "decades."  Ex. I at 9.  The fact that the Government would even suggest such an extreme wait time—which would be patently impermissible under FOIA—makes clear the need for further Court intervention to ensure timely production.

Plaintiffs respectfully request that the Court impose a production schedule for all remaining records to be produced—encompassing the Government's production of both the parts of Plaintiffs' requests that it has agreed to and the parts at issue on summary judgment.  In a FOIA lawsuit concerning similarly high-profile and time-sensitive records, a Court in this District ordered multiple agencies to process records at a rate of 5,000 pages per month.  *Open Soc'y Just. Initiative v. Cent. Intel. Agency*, 399 F. Supp. 3d 161, 168 (S.D.N.Y. 2019) (imposing production schedule on State and Defense Departments in case concerning documents related to Jamal Khashoggi).  Such a rate would be reasonable in this case, given the urgent and high-profile nature of the documents at issue, and the need to complete production in the "efficient, effective, and timely manner" required by FOIA.  *See Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 93. However, Plaintiffs are cognizant of the resources such a processing rate requires; the Court should order each of the Agencies to process the responsive records at a rate less than half of that: 1,500 pages per month.  The Government should additionally be ordered to submit progress reports every two months to the Court.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' cross-motion for partial summary judgment and deny the Agencies' motion for partial summary judgment.


Dated: Sept. 15, 2023

/s/ *Michael Linhorst*
Stephen J. Fuzesi (Bar No. SF2000)
Michael Linhorst (Bar No. 5600168)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
Email: sfuzesi@wc.com
        mlinhorst@wc.com

For Matters in New York:
WILLIAMS & CONNOLLY LLP
650 Fifth Avenue
Suite 1500
New York, NY 10019

Stephen W. Manning (*pro hac vice*)
Tess Hellgren (*pro hac vice*)
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204
Telephone: 503-922-3042
Facsimile: 503-882-0281
Email: stephen@innovationlawlab.org
          tess@innovationlawlab.org

Sarah T. Gillman (Bar No. SG 9273)
Sarah E. Decker (Bar No. 5850763)
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine Street
New York, New York 10005
Telephone: 347-977-7457
          908-967-3245
Email: gillman@rfkhumanrights.org
          decker@rfkhumanrights.org

*Counsel for Plaintiffs*