UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAITIAN BRIDGE ALLIANCE,
AFRICAN COMMUNITIES
TOGETHER, *and* UNDOCUBLACK
NETWORK,

                              Plaintiffs,

            – *against* –

U.S. DEPARTMENT OF HOMELAND
SECURITY, U.S. CUSTOMS AND
BORDER PROTECTION, U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT, and FEDERAL
BUREAU OF PRISONS,

                              Defendants.

**OPINION & ORDER**

22-cv-8344 (ER)

RAMOS, D.J.:

     Haitian Bridge Alliance, African Communities Together, and UndocuBlack Network (collectively, "Plaintiffs") bring this action against the U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE") (collectively, "DHS Defendants") and the Federal Bureau of Prisons ("BOP").[1]  Before the Court are the parties' cross-motions for partial summary judgment.  Docs. 59, 66.  Plaintiffs seek an order from the Court requiring the DHS Defendants to accept Plaintiffs' proposed additions to a negotiated FOIA proposal, implementing Plaintiffs' preferred search terms, and imposing a record production schedule.  The DHS Defendants oppose these requests, and seek an order rejecting Plaintiffs' proposed additions to the negotiated FOIA proposal, allowing the DHS Defendants to create reasonable search terms, and declining to impose a record

---

[1] According to the DHS Defendants, as of April 12, 2023, the BOP has produced responsive records to Plaintiffs and therefore the agency "believes it has satisfied its obligations under FOIA."  Doc 60 at 6 n.1.  Plaintiffs agree that the BOP is not relevant to the instant motions for partial summary judgment.  Doc. 67 at 10 n.15.

production schedule.  For the following reasons, the DHS Defendants' motion for partial summary judgment is GRANTED and the Plaintiffs' motion is DENIED.

I.      BACKGROUND

   A.  Factual Background

   *1. Mass Migration Event in Del Rio, Texas*

In September 2021, approximately 15,000 Haitian migrants crossed the Rio Grande river border from Mexico and into Del Rio, Texas, to apply for asylum in the United States.  Doc. 1 ¶ 5.  According to Plaintiffs, the U.S. government responded with militarized force against the migrants; prevented individuals from leaving the encampment; harassed and intimidated the migrants; and failed to provide basic provisions including food, water, medical attention, and shelter.  Doc. 1 ¶¶ 6–8.  CBP closed the border at Del Rio on September 17, 2021, and DHS announced a strategy to address the increase in migrants on September 18, 2021.  *Id*. ¶ 10.  During the following two weeks, ICE and CBP moved, processed, transferred, and expelled migrants.  Doc. 1 ¶¶ 12–13; Doc. 61 ¶ 7.  All of the migrants had been removed from Del Rio by September 24, 2021.  Doc. 1 ¶ 12.

   *2. Plaintiffs' FOIA Requests*

On October 1, 2021, Plaintiffs sent the DHS Defendants a FOIA request (the "October 2021 Request"), seeking records concerning the defendants' treatment of the migrants who were present in Del Rio, Texas, during September 2021.  Doc. 1 ¶ 34.  The October 2021 Request contained three requests, each of which contained numerous subparts:  Request No. 1 contained 37 subparts, Request No. 2 contained 15 subparts, and Request No. 3 contained 20 subparts, for a total of 72 numbered requests.  Doc. 61-1.

CBP acknowledged receipt of the October 2021 Request on October 1, 2021. Doc. 1 ¶¶ 46, 50. DHS ultimately successfully[2] acknowledged receipt of the October 2021 Request on January 21, 2022. *Id*. ¶ 40. ICE acknowledged receipt of the October 2021 Request on May 3, 2022. Doc 1 ¶¶ 51, 55. As relevant to the instant motions, the October 2021 Request sought:

> "[a]ll [r]ecords . . . whether formal or informal, created since September 1, 2021, including all revisions of such [r]ecords, related to or reflecting" "plans for responding to the arrival or presence of migrants"; "[a]ctions taken by the Agency[3] or Agency personnel in response to the arrival or presence of migrants"; "[t]he processing of arriving migrants"; "actions or efforts to create and maintain records with respect to migrants"; "actions or efforts to ensure that the processing of migrants . . . complies with the Agency's legal duties under applicable statutes, regulations, and court orders"; the provision of temporary housing, medical care, food, water, and clothing to migrants; the scheduling of "resources and personnel from the Agency, other federal or state agencies, or private companies" to provide housing, medical care, food and water; and all "actions or efforts to determine whether migrants should be placed in removal proceedings."

*See* Doc. 61-1 at 1–13. The October 2021 Request also sought:

> "[a]ll records, whether formal or informal, created since September 1, 2021, including all revisions of such [r]ecords, related to or reflecting correspondence and communications" relating to "plans for responding to, and actions taken by the Agency or Agency personnel in response to, the arrival or presence of migrants," and communications and correspondence with the State of Texas, the Government of Mexico, "any federal or state agency, contractor, or private company," the Republic of Haiti, "partners in the hemisphere," and "senior-level personnel" at the State Department.

*See d*. at 13–16.

On January 28, 2022, DHS informed Plaintiffs that the portions of October 2021 Request described above were "overbroad in scope and did not reasonably describe the

---

[2] DHS claims that it emailed an acknowledgement letter on December 9, 2021. Plaintiffs allege they never received the letter, which "appears to have been sent to an incorrect e-mail address." Doc. 1 ¶ 40–41.

[3] Plaintiffs define Agency to include the DHS Defendants, along with the U.S. Department of Health and Human Services, the U.S. Department of State; the U.S. Department of Justice, and the U.S. National Park Service. Doc. 61-1 at 7.

records sought," and informed Plaintiffs that they had 30 days to resubmit the October 2021 Request.  Doc. 63 ¶ 20.  Plaintiffs did not provide a resubmission.

On February 25, 2022, Plaintiffs sent a second FOIA request (the "February 2022 Request") to DHS and CBP, seeking records concerning any investigations related to the treatment of migrants in Del Rio in September 2021.  *See* Doc. 61 ¶ 19.

3.  *This Litigation and the May 2023 Proposal*

Plaintiffs filed this action on September 30, 2022, seeking declaratory and injunctive relief to compel disclosure of the records sought in the October 2021 and February 2022 Requests.  Doc. 1 ¶ 4.  CBP and DHS are currently processing the February 2022 Request, which is not an issue contested in these motions.  Doc. 60 at 9.

After reviewing the complaint, the DHS Defendants notified[4] Plaintiffs that they were unable to process the portions of of the October 2021 Request described above because, as they previously explained, the Request "did not 'reasonably describe' the records sought as required under 5 U.S.C. § 552(a)(3)."  *Id*.  The parties negotiated the scope of disputed portions of the October 2021 Request for several months[5] afterward.  *Id*.  On May 2, 2023, the DHS Defendants sent Plaintiffs a proposal ("the May 2023 Proposal") that reformulated the disputed portions of the October 2021 Request in a way that the DHS Defendants represented "described particular categories of documents" and would permit "searches for those categories of documents with reasonable effort."  *Id*. at 9–10.

Pursuant to Section A.1 of the May 2023 Proposal, CBP and ICE agreed to search for "[p]olicies, procedures, directives, and formal guidance issued or created by CBP and/or ICE in effect and as applicable to migrants in Del Rio between September 1, 2021,

---

[4] The manner or date of this notification is not described.

[5] The timeframe the parties engaged in their negotiation is not described.

and September 25, 2021" regarding thirteen categories of information.[6]  Doc. 61-3 § A.1.

Pursuant to Section A.2, CBP, ICE and, as applicable, DHS,[7] agreed to search for

"[f]ormal reports or memoranda . . . documenting" six categories of information for

events or circumstances that occurred in Del Rio between September 1, 2021 and

September 25, 2021.[8]  *Id*. § A.2.  Pursuant to Section A.3, all three DHS Defendants

agreed to search for "[r]eports, memoranda, or formal complaints" relating to "the use of

horse patrols, use of force, crowd management, crowd control, restraints, motorcycles,

whips, ropes, reins, aircraft, vehicles, or weapons" against migrants in Del Rio between

September 1, 2021, and September 25, 2021.  *Id.* § A.3.  Pursuant to Section A.4, all three

DHS Defendants agreed to search for "[r]eports, memoranda, or formal complaints"

relating to the intimidation or harassment of migrants, or to prevent migrants from

entering into the United States, between September 1, 2021, and October 25, 2021.  *Id.* §

A.4.  Pursuant to Section A.5, CBP and ICE agreed to search for "records reflecting"

information about the "number of family units with babies born in Del Rio between

September 1, 2021, and September 25, 2021 [who were] expelled, removed, or deported,"

---

[6] These categories concern information about, *inter alia*:  (1) migrants' requests for food, water, housing, medical care, and various hygiene products; (2) how CBP and ICE employees were required to respond to the aforementioned requests; (3) migrant deaths, drownings, pregnancies and other hospitalizations; (4) whether and under what circumstances the CBP could change the amount or speed of water in the portion of the Rio Grande River near Del Rio; (5) the use of horse patrols, use of force, or other restraints against migrants; (6) harassment or intimidation of migrants; (7) arrest, transportation, deportation, removal and expulsion of migrants; (8) processing of migrants arriving at Del Rio; (9) the detention of migrants at Del Rio; (10) the "applicability of Title 42" and discretion given to CBP and/or ICE officials in determining migrants' removal or expulsion from the United States; (11) whether CBP and/or ICE could inform migrants where they were being transported; (12); receipt, retention, and return of migrants' belongings; and (13) the manner in which employees tracked migrants' demographic data.

[7] Plaintiffs requested, and DHS ultimately agreed, for DHS to conduct searches for records responsive to §§ A.2(a)-(d) and A.2(f), A.3, A.4 and A.6 of the May 2023 Proposal.  Doc. 60 at 10 n.2.

[8] These categories concern information about, *inter alia*:  (1) the expulsion or deportation of family units with infants born in Del Rio; (2) deaths, drownings, pregnancies, and other hospitalization of migrants; (3) arrest, transportation, deportation, removal and expulsion of migrants; (4) whether and under what circumstances CBP and/or ICE provided food, water, housing, medical care, and various hygiene products; (5) CBP's temporary closure of the Del Rio Port of Entry and re-routing of traffic; and (6) any investigation, inspection, evaluation, or audit concerning the mistreatment of migrants.

as well as the "destination . . . and legal authority under which each [aforementioned] family unit" was "expelled, removed, or deported." *Id*. §A.5.

Pursuant to Section A.6, all three DHS Defendants agreed to search for "ICE and/or CBP [r]ecords reflecting . . . the total volumes or quantities of food; water; housing or shelter; medical care (including COVID-19 vaccinations and testing); sanitation facilities; hygiene products; diapers; baby food and formula; and clothing"; as well as "the total numbers of deaths of migrants; drownings of migrants; pregnancies of migrants; migrants going into labor or giving birth; and hospitalizations of migrants in Del Rio between September 1, 2021, and September 25, 2021." *Id*. § A.6.

Section B of the May 2023 Proposal restated a portion of the October 2021 Request, and is not contested. *Compare* Doc. 61-1 at 16–18 with Doc. 61-3 at 5–9. Section C of the May 2023 Proposal restated the February 2022 Request in its entirety, and is likewise not in dispute. *Compare* Doc. 61-2 at 4 with Doc. 61-3 at 7–8.

Finally, pursuant to Section D, the DHS Defendants agreed to search for email communications relating to the "the DHS Defendants' policies, directives, and actions relating to the treatment, processing, and removal of migrants in [] Del Rio" in September 2021 for fifteen custodians.[9]  *Id*. § D.

Plaintiffs' agreed to most of the May 2023 Proposal, but the parties have reached an impasse on four issues.  First, Plaintiffs proposed[10] additions to Section A.6 ("Request No. 6"), demanding that the DHS Defendants also search for "[r]ecords reflecting the following data":

    a.  "total number of requests made by [m]igrants in Del Rio between September 1, 2021, and September 25, 2021, for each of the following:  food; water;

---

[9] Although the May 2023 Proposal lists fourteen proposed custodians, CBP has subsequently agreed to search the e-mail communications and attachments of an additional custodian.  Doc. 60 at 22 n.6.

[10] The DHS Defendants' May 2023 proposal did not accept Plaintiffs' edits to a prior draft of the proposal. Specifically, the DHS Defendants sent a letter with a draft of the May 2023 Proposal to Plaintiffs on April 12, 2023.  Doc. 61-4.  Plaintiffs sent a document with a redline of proposed edits to the DHS Defendants on April 19, 2023.  *Id*.

housing or shelter; medical treatment (including COVID-19 vaccinations and testing); sanitation facilities; hygiene products; diapers; baby food and formula; and clothing, and documents sufficient to show how the Agency processed and resolved any request for the same."

b.  "how much the Agency provided of and how many times the Agency provided each of the following:  food; water; housing or shelter; medical care (including COVID-19 vaccinations and testing); sanitation facilities; hygiene products; diapers; baby food and formula; clothing; and medical treatment to [m]igrants in Del Rio between September 1, 2021, and September 25, 2021."

c.  "how the Agency tracked and addressed deaths of [m]igrants; drownings of [m]igrants; pregnancies of [m]igrants; [m]igrants going into labor or giving birth; and hospitalizations of [m]igrants in Del Rio between September 1, 2021, and September 25, 2021."

d.  "the number of [m]igrants in Del Rio between September 1, 2021, and September 25, 2021, who died, drowned, were pregnant, went into labor, gave birth, or were hospitalized."

e.  "between September 1, 2021, and September 25, 2021, the types of documents collected from or returned to [m]igrants in Del Rio, given to [m]igrants in Del Rio (e.g., colored paper tickets), and created during processing of [m]igrants in Del Rio."

f.  "the age, immigration history (if any) expressed fear of return (if applicable), medical condition, and familial relationships of [m]igrants in Del Rio between September 1, 2021, and September 25, 2021, and [r]ecords sufficient to show how the Agency tracked the same."

g.  "the race, country of origin or domicile, age, immigration history (if any), expressed fear of return (if applicable), medical condition, and familial relationships of each member of a family unit with a baby born in Del Rio between September 1, 2021 and September 25, 2021 that was expelled, removed, or deported."

*See* Doc. 61-4 at 5–6.  The DHS Defendants oppose this request.  Second, Plaintiffs proposed adding a new section ("Request No. 7"), which would obligate the DHS Defendants to conduct additional searches for "[r]ecords reflecting the following information, to the extent not captured in the preceding sections Nos. 1–6":

a.  "if, when, and how the amount or speed of water flowing through the Rio Grande River within the Del Rio Sector changed between September 1, 2021 and September 25, 2021."

b.  "if, when, and how horse patrols, use of force techniques, crowd management techniques, crowd control techniques, restraints, motorcycles, whips, ropes, reins, aircraft, vehicles, and weapons were used in Del Rio between September 1, 2021 and September 25, 2021."

      c.  "if, when, and how [m]igrants in Del Rio between September 1, 2021 and September 25, 2021 were threatened, had violence used against them, were intimidated, were harassed, were discriminated against, or were deterred from arriving in Del Rio."

      d.  "how the Agency determined whether and under what legal authority (e.g., Title 8, Title 42 Order) [m]igrants in Del Rio between September 1, 2021 and September 25, 2021 should be arrested, removed, detained, deported, or expelled."

      e.  "how the Agency determined to which country deported or expelled [m]igrants in Del Rio between September 1, 2021 and September 25, 2021 should be sent."

      f.  "how the Agency determined whether [m]igrants in Del Rio between September 1, 2021 and September 25, 2021 who were placed in Title 8 removal processing should be detained, paroled, or released on their own recognizance pending removal."

      g.  "how the Agency processed [m]igrants in Del Rio between September 1, 2021 and September 25, 2021, including what documentation or other written records were created (or should have been created) during processing."

*See* Doc. 61-4 at 6.  Again, the DHS Defendants oppose this request.

Third, Plaintiffs demand that the DHS Defendants use Plaintiffs' proposed search terms while searching the emails of the fifteen custodians pursuant to Section D of the May 2023 Proposal.[11]  *See* Doc. 61-4 at 6–7.  The DHS Defendants want to employ their own search terms, which they have not disclosed to Plaintiffs or the Court.  Doc. 60 at 22.

Fourth, Plaintiffs ask the Court to order the DHS Defendants to comply with a document production schedule at a rate of 1,500 pages per agency per month.  Doc. 67 at 27.  The DHS Defendants counter with an offer to produce documents at a monthly rate of

---

[11] Specifically, Plaintiffs requested the following search terms:

- Time frame:  9/1/2021 to 10/31/2021
  - ("Del Rio" OR Acuna OR Acuña) AND (migrant! OR Haiti! OR immigra! OR alien! OR illegal! OR reentrant! OR famil!)
- Time frame:  9/1/2021 to 10/1/2021
  - (Haiti!) w/5 (migrant! OR immigra! OR alien! OR illegal!)
- Time frame:  10/31/2021 to Date of Commencement of Search
  - ("Del Rio" OR Acuna OR Acuña) AND (migrant! OR Haiti! OR immigra! OR alien! OR illegal! OR reentrant!) AND (investigat! OR audit! OR evaluat! OR inspect!)

Doc. 61-4 at 6–7.

750 pages from ICE, 500 pages from CBP, and 400 pages from DHS.  *See* Doc. 71 ¶ 26; Doc. 72 ¶ 44; Doc. 73 ¶ 15.

### B. Procedural Background

Plaintiffs filed this action on September 30, 2022.  Doc. 1.  The DHS Defendants moved for partial summary judgment on August 11, 2023, seeking an order that rejects Plaintiffs' Requests Nos. 6 and 7 to the May 2023 Proposal[12] and allows the DHS Defendants to craft search terms with respect to Section D of the May 2023 Proposal. Doc. 59.  In support of their motion, the DHS Defendants also submitted declarations from ICE FOIA Officer Fernando Pineiro (Pineiro Decl.) (Doc. 61), CBP FOIA Officer Patrick Howard (Howard Decl.) (Doc. 62), and DHS FOIA Officer Catrina Pavlik-Keenan (Pavlik-Keenan Decl.) (Doc. 63).

Plaintiffs opposed and cross-moved for partial summary judgment on September 15, 2023.  Doc. 66.  Plaintiffs seek an order that requires the DHS Defendants to:  (1) search for the documents sought in Plaintiffs' Requests Nos. 6 and 7 to the May 2023 Proposal; (2) adopt Plaintiffs' proposed search terms with respect to Section D of the May 2023 Proposal; and (3) produce all remaining records at a rate of 1,500 pages per agency per month.  Doc. 67 at 15.

The DHS Defendants submitted their memorandum of law in opposition to Plaintiff's motion and in support of their motion on October 13, 2023.  Doc. 70.  Finally, Plaintiffs submitted their reply brief on October 27, 2023.  Doc. 74.[13]

---

[12] The DHS Defendants also request that the Court limit the October 2021 Request as modified by the DHS Defendants in the May 2023 Proposal.  Doc. 60 at 16.  While Plaintiffs do not specifically address this argument, they do contest the May 2023 Proposal on other grounds–*i.e*, the inclusion of Request Nos. 6 and 7, using Plaintiffs' proposed search terms, and adding a record production schedule.

[13] Neither party has submitted a Local Rule 56.1 statement because as a general rule in this Circuit, such statements are not required for FOIA actions.  *See New York Times Co. v. U.S. Dep't of Justice*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) (internal quotations marks and alterations omitted).

## II.    LEGAL STANDARDS

Courts almost exclusively resolve FOIA actions through the submission of cross-motions for summary judgment.  *See NRDC v. U.S. Dep't of Interior*, 73 F. Supp. 3d 350, 355 (S.D.N.Y. 2014).  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Where, as here, the parties have filed cross-motions for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'"  *N.Y. Times Co. v. U.S. Dep't of Defense*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007) (quoting *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).  Importantly:

> A district court in a FOIA case may grant summary judgment in favor of an agency on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.

*Grand Central Partnership, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quotation marks and internal citations omitted).  "The [a]ffidavits submitted by an agency are accorded a presumption of good faith."  *Wilner v. Nat'l Security Agency*, 592 F.3d 60, 69 (2d Cir. 2009) (quoting *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994)) (quotation marks and internal citations omitted).

For a FOIA request to be proper, the request must "reasonably describe" the records sought.  5 U.S.C. § 552(a)(3)(A).  The "reasonable description" requirement has two criteria that are relevant here.  First, the searching agency must be able "to determine precisely what records are being requested."  *Amnesty Int'l USA v. CIA*, No. 07-cv-5435 (LAP), 2008 WL 2519908, at *12 (S.D.N.Y. June 19, 2008) (quotation marks omitted).  In determining whether records have been "reasonably described" for the purposes of the FOIA, "[t]he linchpin inquiry is whether the agency is able to determine precisely what records (are) being requested."  *Yeager v. Drug Enforcement Admin.*, 678 F.2d 315, 326

(D.C. Cir. 1982).  "[B]road, sweeping requests lacking specificity are not permissible" under the statute.  *Yagman v. Pompeo*, 868 F.3d 1075, 1081 (9th Cir. 2017) (citations omitted).

Second, "a professional employee of the agency familiar with the subject matter" must be able to "locate the records with a reasonable amount of effort."  *Informed Consent Action Network v. FDA*, No. 20-cv-689 (AJN), 2022 WL 902083, at *2 (S.D.N.Y. Mar. 28, 2022) (internal quotation marks omitted).  "An agency need not respond to a request that is so broad as to impose an unreasonable burden upon the agency, such as one which require[s] the agency to locate, review, redact, and arrange for inspection a vast quantity of material."  *Seife v. U.S. Dep't of State*, 298 F. Supp. 3d 592, 611 (S.D.N.Y. 2018) (citations omitted).  A request requires unreasonable effort if it would effectively require the agency to search for all agency records on a given topic. *See Nat'l Sec. Counselors v. CIA*, 969 F.3d 406, 409-10 (D.C. Cir. 2020) (finding unduly burdensome a FOIA request for all records "pertaining to the IBM supercomputer named Watson" which would require a search of "every [agency] office for any documents containing the word Watson.").  "The rationale for this rule is that FOIA was not intended to reduce government agencies to full-time investigators on behalf of requestors." *Freedom Watch, Inc. v. CIA*, 895 F. Supp. 2d 221, 228 (D.D.C. 2012) (citations omitted). If an agency claims that responding to a request is unreasonable, "it bears the burden to provide [a] sufficient explanation as to why such a search would be unreasonably burdensome."  *Seife*, 298 F. Supp. 3d at 612 (quoting *Ayuda, Inc. v. Fed. Trade Comm'n*, 70 F. Supp. 3d 247, 275 (D.D.C. 2014)).

### III.    DISCUSSION[14]

     *1. Plaintiffs' Proposed Additions to the May 2023 Proposal Are Unreasonably Broad and Burdensome*

     *a. Plaintiffs Request No. 6*

The DHS Defendants argue that, with the exception of certain data that they agreed to search for,[15] the remainder of Plaintiffs' Request No. 6 does not reasonably describe the records it seeks and would require unreasonable effort to process.  Doc. 60 at 18–21.  Plaintiffs contend that Request No. 6 does reasonably describe the records it seeks, and would not be unduly difficult for the DHS Defendants to process.  Doc. 67 at 16–17.  Doc. 67 at 16–20.

For Request No. 6 to be proper, the DHS Defendants must:  (1) be able to determine precisely what records are being requested and (2) agency employees familiar with the subject matter must be able to locate the records with a reasonable amount of effort.  *See Yeager*, 678 F.2d at 326; *Informed Consent Action Network*, 2022 WL 902083 at *2.  FOIA does not require the DHS Defendants to review such a vast amount of materials that it imposes an unreasonable burden on the agencies.  *Seife*, 298 F. Supp. 3d at 611.

Declarations from the DHS Defendants' FOIA Officers assert that Request No. 6 is overbroad and would require a vast review.  Request No. 6 would allegedly require "[DHS to] search virtually all communications throughout any and all DHS[] Offices to determine how individual employees likely not employed by DHS[] responded to specific requests for food, water, housing, medical treatment, and other necessities, during the

---

[14] As a preliminary matter, Plaintiffs' reply raises for the first time the argument that agency declarations are only entitled to a presumption of good faith on summary judgment when they present "factual assertions," not "agencies' interpretations of requests."  Doc. 74 at 6.  However, new arguments first raised in reply papers are not a proper basis for granting summary judgment and should not be considered.  *United States v. E. River Housing Corp.*, 90 F. Supp. 3d 118, 162 (S.D.N.Y. 2015) (collecting cases); *see also Rowley v. City of N.Y.*, No. 00-cv-1793 (DAB), 2005 WL 2429514, at *5 (S.D.N.Y. Sept. 30, 2005) ("This Circuit has made clear it disfavors new issues being raised in reply papers.").  Accordingly, the Court declines to consider this argument.

[15] The DHS Defendants have agreed to search for Plaintiff's proposed Request Nos. 6(a) and 6(d) "with some modifications."  *See* Doc. 60 at 13.

relevant period."  Pavlik-Keenan Decl. ¶ 27; *see also* Pineiro Decl. ¶¶ 29–34 (explaining that Request No. 6 would require ICE to "search virtually all daily operational communications" and "all migrant health records" such that it "does not reasonably describe the records sought."); Howard Decl. ¶¶ 25–30 (same for CBP).  Plaintiffs do not provide any contradictory evidence or evidence of the declarants' bad faith, and the declarations are reasonably detailed with respect to Request No. 6.  *See Grand Central Partnership Inc.*, 166 F.3d at 478; *Wilner*, 592 F.3d at 69.  Accordingly, the Court finds it can rely on the DHS Defendants' declarations from agency FOIA Officers in its analysis.

Plaintiffs assert that Request No. 6's limitation of its scope to a search for documents "reflecting" or "sufficient to show" the requested information means "does not require the collection of all documents" but instead is limited to "specific data and information—typically in the aggregate."  Doc. 67 at 17–18.  But Request No. 6 must be read "as drafted."  *American Ctr. for Law and Justice v. DHS*, 573 F. Supp. 3d 78, 86 (D.D.C. 2021).  The plain language of Request No. 6 is not limited total data, and if Plaintiffs only sought such aggregate information, they could have made this request explicit.  Moreover, Plaintiffs do not explain how the DHS Defendants' reading of the request is an unfair interpretation of the scope of the request, especially considering the declarations from FOIA Officers who are familiar with the DHS Defendants' record keeping systems.

Plaintiffs next argue that the DHS Defendants cannot read FOIA requests in ways that conflict with the text of the requests and are broader interpretations than what the text supports, and that they must adjust their records search if they misunderstand the scope of a request.  Doc. 67 at 9–10.  However, Plaintiffs do not plausibly establish that the DHS Defendants' have misread or unfairly interpreted the FOIA request, as explained in more detail below.

Here, Request 6(a) asks for "[r]ecords reflecting" "any request" for food, water, housing or shelter, and other necessities.  Doc. 61-4 at 5.  Request 6(b) asks for "[r]ecords

reflecting" "how much" and "how many times" DHS employees provided these necessities.  *Id*.  The Court agrees with the FOIA Officers' declarations, and also finds that by their plain text, Request 6(a) and 6(b) would necessitate a search and review of all employee communications that may mention individual migrants' requests for these items.  *See* Pineiro Decl. ¶¶ 29–33; Howard Decl. ¶¶ 25–29; Pavlik-Keenan Decl. ¶ 27.

Request 6(c) seeks "[r]ecords reflecting" "how the [DHS Defendants] tracked and addressed" migrant deaths, drownings, pregnancies, labor and deliveries, and hospitalizations.  Doc. 61-4 at 5.  The Court again agrees with the FOIA Officers' declarations and also finds, by their plain text, that Request 6(a) and 6(b) would necessitate a search of virtually all migrant health records to discern which of those records "reflected" the requested categories of information.  *See* Pineiro Decl. ¶ 31; Howard Decl. ¶ 27; Pavlik-Keenan Decl. ¶ 27.

Request 6(e),[16] which seeks "[r]ecords reflecting" "the types of documents" created, collected from, returned to, given to, and created by the agencies when "processing" migrants in Del Rio, Doc. 61-4 at 5–6, lacks limiting language or a definition of processing.  The Court is persuaded that completing this search would require review of virtually all operational communications between migrants and agency employees, based on the request's plain text and the FOIA Officers' declarations.  *See* Pineiro Decl. ¶ 32; Howard Decl. ¶ 28.

Request 6(f) seeks "[r]ecords sufficient to show how the Agency tracked" "the age, immigration history (if any), expressed fear of return (if applicable), medical condition, and familial relationships of Migrants in Del Rio."  Doc. 61-4 at 6.  Request 6(g) seeks similar information, in the form of "records reflecting" the "race, country of origin or domicile, age, immigration history (if any), expressed fear of return (if applicable), medical condition, and familial relationships" for migrants with a baby born

---

[16] Request 6(d) is not in dispute.

in Del Rio who were "expelled, removed, or deported." *Id*. The Court agrees with the FOIA Officers' declarations, and also finds that the plain text of Request 6(f) and 6(g) would necessitate searches of ICE and CBP's records, law enforcement databases, and Alien files[17] of every migrant that was present in Del Rio. *See* Pineiro Decl. ¶ 33; Howard Decl. ¶ 29.

In sum, The Court finds that the disputed portions of Request No. 6 do not identify precisely what records are being requested. *Yeager*, 678 F.2d at 326. Due to this overbreadth, the Court finds that Request No. 6 would not allow agency employees familiar with the subject matter to locate the records with a reasonable amount of effort. *See Seife*, 298 F. Supp. 3d at 611; *Informed Consent Action Network*, 2022 WL 902083 at *2; *Nat'l Sec. Counselors*, 969 F.3d 409-10. Accordingly, the Court finds that Request No. 6 is not reasonable.

   b. *Request No. 7*

Request No. 7 seeks "[r]ecords reflecting" an additional seven categories of information from the Del Rio during the time period between September 1, 2021 and September 25, 2021 "to the extent not captured in the preceding [Request No. 6] . . . ." Doc. 61-4 at 6. These categories include: "if, when, and how the amount or speed of water flowing through the Rio Grande River within the Del Rio Sector changed," Request 7(a); "if, when, and how horse patrols, use of force techniques," and other techniques were used against migrants, Request 7(b); "if, when, and how" migrants were "threatened, had violence used against them, were intimidated, were harassed, were discriminated against, or were deterred from arriving in Del Rio," Request 7(c); how the DHS Defendants "determined and under what legal authority" migrants in Del Rio "should be arrested, removed, detained, deported, or expelled," Request 7(d); how they

---

[17] An Alien file, or A-file, "contains all the individual's official record material such as naturalization certificates; various forms (and attachments, e.g., photographs); applications and petitions for benefits under the immigration and nationality laws; reports of investigations; statements; reports; correspondence; and memoranda[.]" *Dent v. Holder*, 627 F.3d 365, 372 (9th Cir. 2010).

"determined to which country deported or expelled" migrants would be sent to, Request 7(e); how they determined whether migrants in Del Rio "should be detained, paroled, or released on their own recognizance pending removal, Request 7(f); and how they processed migrants, including what "documentation or other written records were created (or should have been created), Request 7(g).  Doc. 61-4.

The DHS Defendants argue that this request would also require the agencies to review virtually all migrant efforts from the relevant time period.  Doc. 60 at 22. Plaintiffs respond that the request lists specific categories that are confined to a specific time period and place.  Doc. 67 at 20–22.

Declarations from the DHS Defendants' FOIA Officers assert that Request No. 7 "does not reasonably describe the records sought" because the clause "[r]ecords reflecting the following information, to the extent not captured [by the preceding Request No. 6]" creates "the same problems of vagueness and overbreadth" as the initial disputed portions of the October 2021 Request, which did not permit the agency to "determine precisely which records Plaintiffs are seeking[.]"  Pavlik-Keenan Decl. ¶¶ 18, 30; *see* Pineiro Decl. ¶ 37 (same); Howard Decl. ¶ 33 (same).

While Plaintiffs argue that Request No. 7 is not overbroad because it lists specific categories and is confined to events in a given location, Doc. 67 at 20, this does not mean that the request reasonably describes the records requested such that agency personnel can identify the records with reasonable effort. *See Yeager*, 678 F.2d at 326; *Informed Consent Action Network*, 2022 WL 902083 at *2.  Plaintiffs also contend that the DHS Defendants misread the language in Request No. 7 in reference to records not captured by Request No. 6, because the agencies can "disregard Plaintiffs' attempt to reduce their burden" and simply "produce documents twice" to avoid duplicative searches.  Doc. 67 at 22.  But this also does not respond to the alleged overbreadth of the request.

The agency declarations are reasonably detailed in response to Request No. 7, and are not rebutted by contradictory evidence or evidence of bad faith.  *See Grand Central*

*Partnership Inc.*, 166 F.3d at 478; *Wilner*, 592 F.3d at 69.  Accordingly, the Court finds it can rely on the DHS Defendants' declarations from agency FOIA Officers.

The Court agrees with the FOIA Officers' declarations that Request No. 7 requires the DHS Defendants to review a vast amount of materials.  *See* Pineiro Decl. ¶ 37; Howard Decl. ¶ 33; Pavlik-Keenan Decl. ¶ 30.  Additionally, by its plain text, the Court finds that the request also shifts the burden to the DHS Defendants to guess which additional records might not be "not captured by the preceding Request Nos. 1–6." Accordingly, the Court finds that Request No. 7 is overbroad such that it does not reasonably describe the records sought, *see Yeager* 678 at 326, and does not enable DHS personnel to locate the records with a reasonable amount of effort.  *See Seife*, 298 F. Supp. 3d at 611.; *Ctr. for Immigr. Stud.*, 628 F. Supp. 3d at 271.[18] Therefore, Request No. 7 is not reasonable.

The Court therefore finds that the disputed portions of Request Nos. 6 and the entirety of Request No. 7 should not be added to the May 2023 Proposal.

*2.   The DHS Defendants Do Not Need to Use Plaintiff's Proposed Search Terms*

Here, pursuant to Section D of the May 2023 Proposal, the parties have agreed to search the emails of certain custodians, *see* Pineiro Decl. at 7–8, but have been unable to reach agreement regarding the search terms to be applied.  Plaintiffs advocate for their proposed search terms and argue that the DHS Defendants do not show why Plaintiffs' terms are unreasonable.  Doc. 67 at 24–25.  The DHS Defendants contend it is within their discretion to craft search terms.  Doc. 60 at 22–23.

"Federal agencies have discretion to create search terms that they believe are reasonably tailored to uncover documents responsive to a FOIA request" and "FOIA petitioners cannot dictate the search terms to be used."  *Brennan Center for Justice v.*

---

[18] The parties' also dispute is whether Request No. 7 is duplicative of records the DHS Defendants have already agreed to search for in the May 2023 Proposal.  *See* Doc. 70 at 11, Doc. 74 at 8.  Because the Court finds that Request No. 7 is unreasonable on other grounds, it need not address this argument.

*DOJ*, 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019) (internal citations omitted); *see also Agility Pub. Warehousing Co. K.S.C. v. Nat'l Sec. Agency*, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) ("There is no bright-line rule requiring agencies to use the search terms proposed by a plaintiff.") (quotation marks and internal citations omitted).   However, an agency's choice of search terms is not final.   Where challenged, agencies have to explain why clearly relevant search terms were not used.   *See Immigrant Defense Project v. United States Immigration and Customs Enforcement*, 208 F.Supp.3d 520, 528 (S.D.N.Y. 2016).

In other words, if requesters disagree with the search terms used by an agency, they may challenge the adequacy of the agency's search after the agencies' produce any responsive records.   *See New York Times Co. v. United States Dep't of Just.*, 390 F. Supp. 3d 499, 511 (S.D.N.Y. 2019) ("To prevail on a motion for summary judgment in a FOIA action, the government has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA."); *Immigrant Def. Project*, 208 F. Supp at 526 ("A withholding agency . . . can demonstrate the adequacy of its search at the summary judgment stage through the submission of detailed declarations describing the search procedures used."); *American Chemistry Council, Inc. v. HHS*, 953 F. Supp. 2d 120, 121 (D.D.C. 2013) (noting prior order holding that it was "premature to rule on the adequacy of Defendants' search before they had submitted supporting declarations detailing their efforts.").

Here, the DHS Defendants have not yet finished their search and production of the requested records.   The parties have not briefed whether the DHS Defendant's search ignored clearly relevant search terms, nor have the DHS Defendants provided declarations regarding the sufficiency of their search.   *See Immigrant Def. Project*, 208 F. Supp at 526, 528.   Plaintiffs' argument on the sufficiency of the DHS Defendants' search is premature, and should be brought, if at all, after the DHS Defendants' complete their search and production of documents.   Indeed, Plaintiffs do not cite a single case where a

court required an agency to use a FOIA requester's proposed search terms before the agency had completed these actions.  All of the cases cited by Plaintiffs to support their proposition were litigated on summary judgment *after* the defendant agencies had completed their searches and produced responsive records.[19]

Plaintiffs are correct that the DHS Defendants have not explained why Plaintiffs' proposed terms are inadequate or have presented the DHS Defendants' preferred search terms.  Doc. 74 at 9.  But this is not the DHS' Defendants burden to prove at this point in the litigation.  It is within the DHS Defendants' discretion to choose the initial search terms that they believe are reasonably tailored to uncover responsive documents.  *See Brennan Center for Justice*, 377 F. Supp. 3d at 434.  Indeed, precedent from this Circuit and others squarely supports the DHS' Defendants' position.  *See Doyle v. U.S. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27, 55 (S.D.N.Y. 2018) (finding FOIA requesters cannot "nit-pick[]" an agency's choice of search terms);  *Agility Pub. Warehousing* 113 F. Supp. at 339; *Bigwood v. Dep't of Defense*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015) ("[A] FOIA petitioner cannot dictate the search terms for his or her FOIA request.").

Plaintiffs also assert that the DHS Defendants' discretion to craft search terms is not as important in this case, since Plaintiffs do not ask the DHS Defendants to conduct any additional review to evaluate the records' responsiveness to the FOIA requests.  Doc. 67 at 24.  However, this prudential argument has nothing to do with the DHS Defendants' legal discretion to choose search terms.

---

[19] *See Brennan Center. for Justice*, 377 F. Supp. 3d at 432–434 (ruling on adequacy of search based on agency's sworn declarations detailing the completed searches that had been performed); *Immigrant Defense Project v. DHS*, No. 20-cv-10625 (RA), 2023 WL 1966178, at *1, 3–6 (S.D.N.Y. Feb. 13, 2023) (same); *NAACP Legal Defense & Educ. Fund, Inc. v. Dep't of Justice*, 463 F. Supp. 3d 474, 479–482, 485–89 (S.D.N.Y. 2020) (same); *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enforcement Agency*, 877 F. Supp. 2d 87, 94–95 (S.D.N.Y. 2012) (same); *Fox News Network, LLC v. U.S. Dep't of the Treasury*, 678 F. Supp. 2d 162, 165–166 (S.D.N.Y. 2009) (same).

In sum, the Court finds that at this stage of the litigation, the DHS Defendants do not need to apply Plaintiff's proposed search terms.

### 3.  *Plaintiff's Proposed Document Production Schedule Is Not Warranted*

Plaintiffs also request that the Court impose a record production schedule of 1,500 pages per month for each agency, on the basis that the DHS Defendants have allegedly "missed [their] FOIA-imposed deadline."  The DHS Defendants respond that FOIA imposes no statutory timeline for record production.  Doc. 70 at 15.

Once an agency has received a FOIA request, it must "make and communicate its 'determination' whether to comply with a FOIA request . . . within 20 working days of receiving the request, or within 30 working days in 'unusual circumstances.'" *Citizens for Resp. and Ethics in Washington v. Fed. Election Comm'n*., 711 F.3d 180, 189 (D.C. Cir. 2013) (citing 5 U.S.C. § 552(a)(6)(A)(i)).  If the agency fails to make the determination within the statutory timeframe, the requestor may sue to enforce compliance with the statute.  *See* 5 U.S.C. § 552(a) (6)(C).  FOIA's 20- or 30-day timeline does not create a deadline for document production.  *Citizens for Resp. and Ethics in Washington*, 711 F.3d at 189 ("[A] 'determination' does not require actual production of the records.").  Instead, once a determination of whether to comply with a request is made, "FOIA requires that the agency make the records promptly available."  *Id.* (citations omitted).  Accordingly, the agency has "some additional time to physically redact, duplicate, or assemble for production the documents that it has already gathered and decided to produce."  *Id*. Exactly how much time is context dependent, but would "typically" be "within days or a few weeks of a 'determination,' not months or years."  *Id.* at 188.

 Here, Plaintiffs submitted their initial FOIA request on October 1, 2021.  CBP and ICE acknowledged receipt of the October 2021 Request, but did not otherwise provide any communication until after Plaintiffs' lawsuit was filed on September 30, 2022.  Doc. 1 ¶¶ 46, 50, 51, 55.  DHS acknowledged receipt on January 21, 2022, and determined on January 28, 2022 that the request was too broad in scope.  *Id*. ¶ 40, 42.

Plaintiffs submitted their second request on February 25, 2022 to DHS and CBP.  These agencies likewise did not provide further communication about the February 2022 Request until after Plaintiffs' lawsuit was filed.  *Id*. ¶¶ 72, 73, 77.  Accordingly, the Court finds that the DHS Defendants did not make or communicate their determination within the FOIA statutory deadlines.  However, Plaintiffs' remedy in this situation was to sue to enforce the October 2021 and February 2022 Requests in court.  *See* 5 U.S.C. § 552(a)(6)(C).  That is precisely what Plaintiffs did.  *See Citizens for Resp. and Ethics in Washington*, 711 F.3d at 188–89.

The DHS' Defendants' only remaining statutory duty was to make the records available "promptly," which is a context-dependent term, but would not generally take "months or years" in a typical request.  Plaintiffs argue that it would be hypothetically possible for the DHS Defendants to produce documents at a faster rate, citing other cases where other agencies (including the Defendant agencies) processed more documents per month than what the DHS Defendants propose in this case.  Doc. 74 at 14.  Putting aside the different FOIA requests at issue in those cases, the fact that agencies have processed documents at a faster rate does not impose a legal duty on the DHS Defendants to follow suit in this case, especially when processing 1,500 pages per month per agency is not practicable and would cause major disruption to the processing of other FOIA requests.  *See* Howard Decl. II ¶¶ 27–29, 35, 37–38; Pineiro Decl. II ¶ 14, 16–17, 20, 23, 26; Pavlik-Keenan Decl. II ¶ 17, 18, 20, 22.

Plaintiffs also rely on *Seavey v. Department of Justice* to argue that the Court has the authority to impose their requested production schedule, Doc. 74 at 11.  *See* 266 F. Supp. 3d 241, 245 (D.D.C. 2017).  But this argument misses the mark.  Seavey involved a case where the agency identified approximately 100,000 pages of potentially relevant documents, and as such a complete turnover of the documents at the agencies' requested rate 500 pages a month of would take over 17 years.  *Id.* at 244, 246.  There has been no

determination of the number of documents at issue in this case, and accordingly, a similar remedy is not warranted at this stage in the litigation.

As explained by the agency declarants, CBP, ICE, and DHS can commit to work in good faith to process 500 pages, 750 pages, and 400 pages per month, respectively, which is the same commitment each agency routinely makes in litigation cases. *See* Howard Decl. II ¶¶ 36, 43; Pineiro Decl. II ¶ 23; Pavlik-Keenan Decl. II ¶¶ 16, 21. The agencies' declarations are accorded a presumption of good faith. *See Wilner,* 592 F.3d at 69. The Court therefore finds that the DHS Defendants have met their obligations pursuant to the FOIA statute to process Plaintiff's requests promptly.

Accordingly, the Court will not order Plaintiffs' proposed monthly production schedule of 1,500 pages for each agency.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS the DHS Defendants' motion for partial summary judgment as it pertains to the following:  Requests No. 6 and 7 should not be added to the May 2023 Proposal; the DHS Defendants may exercise their discretion to craft reasonable search terms for responsive records with regard to Section D of the May 2023 Proposal; and the DHS Defendants need not employ Plaintiffs' proposed record production schedule.  Plaintiffs' cross-motion for partial summary judgment is DENIED.  The October 2021 Proposal is limited to the May 2023 Proposal, as modified by the DHS Defendants.

The parties are directed to appear for a telephonic status conference on February 22, 2024 at 11:30 AM.  The parties are directed to call (877) 411-9748 at that time and

enter access code 3029857#.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 59 and 66.

It is SO ORDERED.

Dated:   February 7, 2024
New York, New York

_____
EDGARDO RAMOS, U.S.D.J.